Solomon SALZHANDLER, Plaintiff-
Appellant,

v.

Louis CAPUTO, as President, or ·Martin
Rarback, as Secretary-Treasurer of Dis-
trict Council 9 of New York City, Broth-
erhood of Painters, Decorators and Pa-
perhangers of America, Isadore Web-
man, individually and as President, or
Sam Goldstein, as Treasurer of Local
Union 442, Brotherhood of Painters,
Decorators & Paperhangers of Ameri-
ca, Defendants-Appellees.

No. 138, Docket 27756.

United States Court of Appeals
Second Circuit.

Argued Nov. 28, 1962.

Decided April 18, 1963.

See also D.C., 199 F.Supp. 554.

446

Burton H. Hall, New York City, for plaintiff-appellant.

Harold Dublirer, New York City (Michael A. Buonora, New York City, on the brief), for defendants-appellees.

Before LUMBARD, Chief Judge, and CLARK and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge.

 This appeal raises an important question of the rights of union members under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401–531: whether a union member's allegedly libelous statements regarding the handling of union funds by union officers justify disciplinary action against the member and his exclusion from any participation in the affairs of the union for five years, including speaking and voting at meetings and even attending meetings. We hold that the LMRDA protects the union member in the exercise of his right to make such charges without reprisal by the union; that any provisions of the union constitution which make such criticism, whether libelous or not, subject to union discipline are unenforceable; and that the Act allows redress for such unlawful treatment. Accordingly we reverse the judgment rendered by Judge Wham, sitting in the United States District Court for the Southern District of New York, which dismissed the union member's complaint and we remand the case for further proceedings.

Solomon Salzhandler, a member of Local 442, Brotherhood of Painters, Decorators & Paperhangers of America, brought suit in the district court following the decision of a Trial Board of the union's New York District Council No. 9 that he had untruthfully accused Isadore Webman, the president of the local, of the crime of larceny. The Trial Board found that Salzhandler's "unsupported accusations" violated the union's constitution which prohibited "conduct unbecoming a member * * *", "acts detrimental to * * * interests of the Brotherhood", "libeling, slandering * * fellow members [or] officers of local unions" and "acts and conduct * * * inconsistent with the duties, obligations and fealty of a member." [1]

Salzhandler's complaint alleged that his charges against Webman were an exercise of his rights as a member of the union and that the action of the Trial Board was in violation of the provisions of the LMRDA under which he was entitled to relief.

The undisputed facts developed during the trial in the district court amply support Salzhandler's claims for relief.

Salzhandler was elected financial secretary of Local 442 in 1953. He was re-elected thereafter and at the times in question he was serving a three-year term which was to end June 30, 1962. His weekly compensation as an officer was $35, of which $25 was salary and $10 was for expenses. The dispute giving rise to this suit was touched off in November 1960 by Salzhandler's distribution to members of Local 442 of a leaf-

1. Brotherhood Constitution § 267(5), (6), (10) and (16).

let which accused Webman of mishandling of union funds.

Prior to the audit each July, Salzhandler obtained the checks for the auditor. In going over the union's checks in July 1960 Salzhandler noticed that two checks, one for $800 and one for $375, had been drawn to cover the expenses of Webman and one Max Schneider at two union conventions to which they were elected delegates. The $800 check, drawn on August 21, 1959 to Webman's order, was endorsed by Webman and his wife. The $375 check, drawn on March 4, 1960 to "Cash," was likewise endorsed by Webman and his wife. Schneider's endorsement did not appear on either check. Schneider had died on May 31, 1960.

On July 15, 1960 two checks, each for $6, were drawn as refunds of dues paid by Max Schneider and another deceased member. Such checks were ordinarily mailed to the widows. Webman, however, brought the two checks to Salzhandler and told him to deposit them in a special fund for the benefit of the son of Max Schneider. Salzhandler refused to do this because the checks were not endorsed. Thereafter Sol Feldman and W. Shirpin, who were trustees of the local, each endorsed one of the checks and Salzhandler made the deposit as Webman had requested.[2]

In November 1960 Salzhandler distributed to members of the local a leaflet which accused Webman of improper conduct with regard to union funds and of referring to members of the union by such names as "thieves, scabs, robbers, scabby bosses, bums, pimps, f-bums, [and] jail birds."[3] Attached to the leaflet were photostats of the four checks. With regard to the convention checks, Salzhandler wrote:

"The last convention lasted five days, Monday August 31, to Friday, September 4, 1959. The delegates of 442 presented their credentials Monday, August 31, and on Thursday, September 3, as soon as they got the mileage fare, they disappeared. They were absent at Thursday afternoon session. The most the chairman should have gotten was a weeks pay and allowance— $250.00. The auditor's report shows he got $200 in pay and $300 in expenses—$500, or twice what was coming to him, and also $300 as expenses for the Business Agent. The check was made out to *Cash* for $800 (photostat enclosed). So was the voucher. It does not indicate that Max Schneider got any of it. The same goes for a check made out *only* to I. Webman on March 4, 1960 for another convention, where the chairman was to get $250, but got $375. It does not indicate Schneider got his share. Were the checks legal?"

The leaflet also branded Webman as a "petty robber" of the two $6 checks:

"To prove himself most unworthy of any trust, he performed the cheapest petty act ever. Two widows were refunded each $6.00 for overpayment of dues. Two checks were issued to that effect. The petty robber had two of his friends sign their names and the chairman declared these two checks as contributions to the special tax for Michael Schneider—photostats of checks enclosed."

On December 13, 1960, Webman filed charges against Salzhandler with the New York District Council No. 9 of the union, alleging that Salzhandler had violated the union constitution, § 267, by libelling and slandering him in implying that he, Webman, had not reimbursed Max Schneider for convention expenses, and that he had been a "petty robber" in causing the two $6 checks to be de-

---

2. At the trial Webman testified that he had authorization from the widows.

3. Salzhandler claims that he reported these purported irregularities to the local's membership at a meeting in August 1960.

He further asserts that he filed formal charges against Webman at about the same time. The defendants denied that Salzhandler had taken these actions. Judge Wham made no findings on these disputed facts.

posited in the Michael Schneider fund, rather than being paid over to the two widows. The charge went on to state that Salzhandler was guilty of "acts and conduct inconsistent with the duties, obligations and fealty of a member or officer of the Brotherhood" and that the net effect of the leaflet was untruthfully to accuse an officer of the union of the crime of larceny. For over six hours on the evening of February 23, 1961, Salzhandler was tried by a five-member Trial Board of the District Council. As the union rules permitted, Salzhandler was represented by a union member who was not a lawyer. At the trial, Webman introduced the leaflet. Salzhandler produced the photostats and was questioned by the Trial Board. Webman's witnesses testified that the convention expenditures were approved by the membership. Salzhandler produced three witnesses who testified that Webman had called members names as alleged in the leaflet.

Not until April 2, 1961 did Salzhandler receive notice of the Trial Board's decision and his removal from office and this was from a printed postal card mailed to all members:

"By a decision of the Trial Committee of District Council 9, Sol Saltzhandler [sic] is no longer Financial Secretary of Local Union 442."

Thereafter, on April 4, the District Council mailed to Salzhandler only the final paragraph of its five page "Decision" which read as follows:

"It is our decision that Brother Solomon Salzhandler be prohibited from participating in the affairs of L.U. 442, or of any other Local Union of the Brotherhood, or of District Council 9, for a period of five (5) years. He shall not be permitted during that period to attend meetings of L.U. 442, to vote on any matter, to have the floor at any meeting of any other Local Union affiliated with the District Council, or to be a candidate for any position in any local Union or in the District Council. In all other respects, Brother Salzhandler's rights and obligations as a member of the Brotherhood shall be continued."

Salzhandler did not receive a copy of the full opinion of the Trial Board until after this action was commenced on June 14, 1961. Meanwhile, as the union constitution required appeal within 30 days, Salzhandler filed intraunion appeals with the Secretary-Treasurer of the Council and the General Secretary-Treasurer of the Brotherhood on April 12 and 28. At the time this action was brought, plaintiff had received no word regarding said appeals.[4]

On May 15, 1961, Salzhandler attempted to attend a meeting of the local but was prevented from doing so by Webman. The complaint alleges that Webman assaulted Salzhandler and used violence in removing him.

This action was commenced in the federal court under the Labor-Management Reporting and Disclosure Act of 1959, § 102, 29 U.S.C. § 412, requesting a nullification of the order of the Trial Board, reinstatement in the position as financial secretary, and damages.

Judge Wham dismissed the complaint holding that the Trial Board's conclusion that the leaflet was libelous was sufficiently supported by the evidence. He went further, however, and made an independent finding that the statements were, in fact, libelous. The court held, as a matter of law, that "The rights accorded members of labor unions under Title I of the Labor-Management Reporting and Disclosure Act of 1959 * * * do not include the right of a union member to libel or slander officers of the union." We do not agree.

The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the manage-

4. The parties are agreed that Salzhandler exhausted his intraunion remedies. We do not pass upon the question of whether, in a case such as this, the plaintiff must first exhaust his intraunion remedies.

ment of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.[5] The statute is clear and explicit. Under a subchapter heading of "Bill of Rights of Members of Labor Organizations," §§ 101(a) (1) and (2), 29 U.S.C. §§ 411(a) (1) and (2), provides:

"(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

"(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the

organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

Section 102, 29 U.S.C. § 412, safeguards the rights just enumerated by providing:

"Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

Section 609, 29 U.S.C. § 529 makes doubly secure the protection of the members in the exercise of their rights by providing:

"It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act. The provisions of section 102 shall be applicable in the enforcement of this section."

■ Appellees argue that just as constitutionally protected speech does not include libelous utterances, Beauharnais v. Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952), the speech protected by the statute likewise does not include libel and slander. The analogy to the First Amendment is not convincing. In Beauharnais, the Supreme Court recog-

5. The Senate Select Committee to Investigate Improper Activities in Labor-Management Relations was created to investigate improper activities in the field of labor management relations. S.Res. 74, 85 Cong. 1st Sess., reproduced, 103 Cong. Rec. 1264–1265. It filed a number of reports. See S.Rept. 1417, 85th Cong.2d Sess. (1958); S.Repts. 620, 621, 86th Cong. 1st Sess. (1959); S.Rept. 1139, 86th Cong., 2d Sess. (1960). The legislative history of the "Bill of Rights" portion of the LMRDA is reproduced, 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1102–1119, 1220–1239.

nized the possibility that state action might stifle criticism under the guise of punishing libel. However, because it felt that abuses could be prevented by the exercise of judicial authority, 343 U.S. at 263–264, 72 S.Ct. at 733–734, 96 L.Ed. 919, the court sustained a state criminal libel statute. But the union is not a political unit to whose disinterested tribunals an alleged defamer can look for an impartial review of his "crime."[6] It is an economic action group, the success of which depends in large measure on a unity of purpose and sense of solidarity among its members.

The Trial Board in the instant case consisted of union officials, not judges. It was a group to which the delicate problems of truth or falsehood, privilege, and "fair comment" were not familiar. Its procedure is peculiarly unsuited for drawing the fine line between criticism and defamation, yet, were we to adopt the view of the appellees, each charge of libel would be given a trial de novo in the federal court—an impractical result not likely contemplated by Congress, see 105 Cong.Rec. 6026 (daily ed. April 25, 1959) (colloquy between Senator Goldwater and Senator Clark)—and such a Trial Board would be the final arbiter of the extent of the union member's protection under § 101(a) (2).[7]

6. Union discipline for libel has been characterized as a form of criminal sanction, Summers, The Law of Union Discipline. What Courts Do In Fact, 70 Yale L.J. 175, 178 (1960).

7. See Summers, American Legislation for Union Democracy, 25 Mod.L.Rev. 273, 287:
"The most difficult problem arises when a member is expelled for 'slandering a union officer.' Union debates are characterized by vitriol and calumny, and campaigns for office are salted with overstated accusations. Defining the scope of fair comment in political contests is never easy, and in this context is nearly impossible. To allow the union to decide this issue in the first instance is to invite retaliation and repression and to frustrate one of the principal reasons for protecting this right—to enable members to oust corrupt leadership through the democratic process."

In a proviso to § 101(a) (2), there are two express exceptions to the broad rule of free expression. One relates to "the responsibility of every member toward the organization as an institution." The other deals with interference with the union's legal and contractual obligations.

While the inclusion of only two exceptions, without more, does not mean that others were intentionally excluded, we believe that the legislative history supports the conclusion that Congress intended only those exceptions which were expressed.[8]

The expression of views by Salzhandler did not come within either exception in the proviso to § 101(a) (2). The leaflet did not interfere in any way with the union's legal or contractual obligations and the union has never claimed that it did. Nor could Salzhandler's charges against Webman be construed as a violation of the "responsibility of every member toward the organization as an institution." Quite the contrary; it would seem clearly in the interest of proper and honest management of union affairs to permit members to question the manner in which the union's officials handle the union's funds and how they treat the union's members. It is that interest

8. As initially introduced before the Senate, the freedom of speech section was absolute in form. See 105 Cong.Rec. 5810 (daily ed. April 22, 1959). The section was in fact passed in that form. Id. at 5827. Later the question came to be reconsidered and the free speech section was amended to include the two express exceptions. Id. at 6030 (daily ed. April 25, 1959). In effect, the section as initially passed took away the power of unions to punish for expressions of views. The subsequent amendment restored that power in only two situations.
We are referred to certain statements made during the debate in the Senate which allegedly indicate that "reasonable restraints" on speech were intended. See; e. g., 105 Cong.Rec. 6022 (daily ed. April 25, 1959) (remarks of Senator Kuchel). We find these statements to be ambiguous and we are not persuaded that exceptions other than those specified were intended.

which motivated the enactment of the statute and which would be immeasurably frustrated were we to interpret it so as to compel each dissatisfied and questioning member to draw, at the peril of union discipline, the thin and tenuous line between what is libelous and what is not. This is especially so when we consider that the Act was designed largely to curtail such vices as the mismanagement of union funds, criticism of which by union members is always likely to be viewed by union officials as defamatory.

The union argues that there is a public interest in promoting the monolithic character of unions in their dealings with employers. But the Congress weighed this factor and decided that the desirability of protecting the democratic process within the unions outweighs any possible weakening of unions in their dealings with employers which may result from the freer expression of opinions within the unions.

The democratic and free expression of opinion in any group necessarily develops disagreements and divergent opinions. Freedom of expression would be stifled if those in power could claim that any charges against them were libelous and then proceed to discipline those responsible on a finding that the charges were false. That is precisely what Webman and the Trial Board did here when they punished Salzhandler with a five-year ban of silence and stripped him of his office.

So far as union discipline is concerned Salzhandler had a right to speak his mind and spread his opinions regarding the union's officers, regardless of whether his statements were true or false. It was wholly immaterial to Salzhandler's cause of action under the LMRDA whether he spoke truthfully or not, and accordingly Judge Wham's views on whether Salzhandler's statements were true are beside the point. Here Salzhandler's charges against Webman related to the handling of union funds; they concerned the way the union was managed. The Congress has decided that it is in the public interest that unions be democratically governed and toward that end that discussion should be free and untrammeled and that reprisals within the union for the expression of views should be prohibited. It follows that although libelous statements may be made the basis of civil suit between those concerned, the union may not subject a member to any disciplinary action on a finding by its governing board that such statements are libelous. The district court erred in dismissing the complaint.

Accordingly, we reverse the judgment of the district court and direct entry of judgment for the plaintiff which, among other things, should assess damages and enjoin the defendants from carrying out any punishment imposed by the District Council Trial Board.