Meyer *v.* Joint Council 53, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellants.

Argued November 10, 1964.   Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused February 2, 1965.

402a.

*Edward Davis,* for appellants.

*Richard H. Markowitz,* with him *Richard Kirschner,* and *Wilderman, Markowitz & Kirschner,* for appellants.

*Edward Greer,* with him *Folz, Bard, Kamsler, Goodis & Greenfield,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, January 5, 1965:

Plaintiffs, six individuals, filed a complaint in trespass against seven individuals and five unincorporated labor organizations seeking damages for libel. The alleged defamation appeared in a printed tabloid called "Teamsters Extra"[1] which was specially issued during a campaign preceding a National Labor Relations Board [NLRB] representation election.[2]

---

[1] A copy of the tabloid, Vol. 1, No. 1, is reproduced in the Reporter's statement of the case.

[2] Plaintiffs were campaigning in behalf of a labor organization known as "The Voice of the Teamsters Democratic Organizing Committee" [Voice]. Voice was attempting to oust the defendant local unions as collective bargaining representative for certain employees in a multi-employer association bargaining unit known as "Motor Transport Relations, Inc."

The tabloid in question was circulated in November 1962, about one week before the election was held. After the election was won by defendant unions, Voice filed with the NLRB objections to the conduct of the election and to conduct affecting the results of the election.

One objection alleged that defendant unions had published criminally libelous statements concerning Voice executive board members, and that the statements influenced employees not to vote for Voice and prevented the conduct of the election in a proper atmosphere. The Regional Director of the NLRB was of the view that this objection should be overruled since the allegations involved were not within the special knowledge of the defendants, and Voice had ample opportunity to correct the alleged distortions

The complaint alleged that defendants, with willful and malicious intent to injure plaintiffs, published articles, sketches, and pictures in the "Teamsters Extra" which contained malicious and defamatory material. Among the statements was one which proclaimed that the top officers, members of the executive board, and active leaders of Voice have been individually convicted of one or more of a list of crimes. On the list were such crimes as burglary, manslaughter, rape, sodomy, and corrupting the morals of a minor.[3]

Defendants filed preliminary objections which challenged jurisdiction. These were dismissed by the court below. On this appeal attacking the lower court's ruling, defendants have raised the question of whether the jurisdiction of our state courts is preempted by provisions of the National Labor Relations Act. Certain of the defendants have raised an additional question concerning exhaustion of internal union remedies.

## I

We consider, first, the claim of federal preemption. The landmark case involving preemption in the labor

---

and misrepresentations. The Board accepted this recommendation.

The Board, however, set aside the election on the basis of other recommendations made by the Regional Director.

[3] In its complete listing, the tabloid enumerated assault and battery, disorderly conduct, public indecency, burglary, larceny of auto, nonsupport of family, illegal lottery, hold-up at point of gun, receiving stolen goods, larceny by pickpocket, robbery, unlawful possession of drugs, assault and battery with intent to ravish and rape, rape, sodomy, obscene literature, manslaughter, attempted extortion, booking gambling bets, impersonating police officer, habitual drunk, larceny, corrupting the morals of a minor.

Plaintiffs alleged that use of the pictures, sketches, and words was meant to convey to readers that plaintiffs were hardened criminals, bent on violence, guilty of serious crimes such as rape and burglary and that they were unworthy of consideration as union leaders.

field is *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S. Ct. 773 (1959), which held that a state court lacked jurisdiction to award damages for conduct constituting a tortious unfair labor practice under state law. In that case, the tortious activity consisted of peaceful union picketing designed to compel employers to execute a contract which would provide that only union members, or workers who applied for union membership within 30 days, would remain in their employ.[4] Recognizing a congressional purpose, as expressed in relevant legislation, to foster the development of a uniform national labor policy through administrative regulation by the NLRB, the Supreme Court of the United States based its holding on the general principle that both state and federal courts must defer to the exclusive competence of the Board when the activity involved is arguably subject to Section 7[5] or Section 8[6] of the National Labor Relations Act, as amended. The Supreme Court further noted that previous cases permitting state courts to award damages for tortious activities marked by violence and imminent threats to public order were based on the

---

[4] The employers had refused to execute the contract, claiming that none of the employees had shown a desire to join a union, and that, in any event, they could not accept such an arrangement until one of the unions had been designated by the employees as a collective bargaining agent. It was alleged that the peaceful picketing was designed to exert pressure on customers and suppliers in order to persuade them to stop dealing with the employers and to thereby compel execution of the proposed contract.

[5] Act of July 5, 1935, c.372, §7, 49 Stat. 452, as amended by the Labor Management Relations Act of June 23, 1947, c.120, §101, 61 Stat. 140, 29 U.S.C. §157. Infra note 7.

[6] Act of July 5, 1935, c.372, §8, 49 Stat. 452, as amended by the Labor Management Relations Act of June 23, 1947, c.120, §101, 61 Stat. 140 and Act of October 22, 1951, c.534, §1(b), 65 Stat. 601. 29 U.S.C. §158. Infra note 8.

principle that "the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." Id. at 247, 79 S. Ct. at 781. The Court found no such interest to be involved in the *Garmon* case.

We assume, as defendants contend, that the activities of the defendants in the present case are arguably subject to Section 7[7] or 8[8] of the Act. But even assuming this, we still reach the conclusion that our state courts are not precluded from exercising jurisdiction over libel actions arising from labor activities.[9] Following the principles set forth in *Garmon*,

---

[7] "Employees shall have the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." §7, supra note 5.

[8] Section 8 proscribes certain unfair labor practices. In addition, among its provisions is subsection (c) which reads: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." §8, supra note 6.

[9] Some courts which have faced the question have decided that state jurisdiction over libel published in labor disputes has been preempted by NLRB jurisdiction. *Linn v. United Plant Guard Workers*, 337 F. 2d 68 (6th Cir. 1964); *Blum v. Int'l Ass'n of Machinists*, 42 N.J. 389, 201 A. 2d 46 (1964); *Hill v. Moe*, 367 P. 2d 739 (S. Ct. Alaska 1961), cert. denied, 370 U.S. 916, 82 S. Ct. 1554 (1962); *Warehouse & Produce Workers Local 599, IBT v. United States Gypsum Co.*, 50 C.C.H. Lab. Cas. ¶19,196 (Superior Ct. Wash. 1963); *Schnell Tool & Die Corp. v. United Steelworkers*, 200 N.E. 2d 727 (Ohio C.P. 1964); cf. *Teamsters Local 150, IBT v. Superior Court*, 39 Calif. Rptr. 590, 50 C.C.H. Lab. Cas. ¶19,184 (Calif. Dist. Ct. App. 1964) (refusing injunction for libel). Most of these cases have relied on *Blum*, supra.

A result in accord with our view was reached in *California Dump Truck Owners Ass'n v. Joint Council of Teamsters*, 45 C.C.H.

the question we must determine is whether there is a compelling state interest, especially in the maintenance of domestic peace, upon which state jurisdiction over a libel suit can be predicated.[10]  We believe that such an interest does exist.

In determining that there is such an interest which permits the court below to exercise jurisdiction, we find persuasive the language used in *Garmon* and by the same author in *Beauharnais v. Illinois*, 343 U.S. 250, 72 S. Ct. 725 (1952).  In *Garmon*, the Court explained the important policies which permit state ju-

---

Lab. Cas. ¶50,546 (Calif. Superior Ct. 1962). And see *Salzhandler v. Caputo*, 316 F. 2d 445, 451 (2d Cir.), cert. denied, 375 U.S. 946, 84 S. Ct. 344 (1963) (dictum), to the effect that libelous statements in labor activities can be the basis for civil suits. See Cox, Federalism in the Law of Labor Relations, 67 Harv. L. Rev. 1297, 1321 (1954): "Words privileged under NLRA Section 8(c) may give union leaders a cause for action for defamation." See also *Cussack v. Moran*, 46 C.C.H. Lab. Cas. ¶50,749 (Superior Ct. N.Y. 1963) (implied) (granting damages for labor libel).

[10] In *Linn v. United Plant Guard Workers*, supra note 9, the court of appeals held that neither state nor federal jurisdiction exist where the libelous statements involved grew out of a union organizational campaign. The theory on which this holding was predicated was that under *Garmon* only violence or the threat of violence would permit the exercise of such jurisdiction. We cannot agree that the language used in *Garmon* justifies such a narrow interpretation of the area of jurisdiction left to the state and federal courts. (See also note 16 infra.) Compare Michelman, State Power to Govern Concerted Employee Activities, 74 Harv. L. Rev. 641, 667 (1961): "Thus, if the statements are, as a matter of state law, defamatory and untrue, an employer should have access to the usual remedies for libel or slander. Nor would this seem to be an appropriate occasion for requiring prior submission of the case to the NLRB. Not only are state courts more accustomed to dealing with such issues than is the Board, but since the very elements of the state cause of action will establish that the conduct is not federally privileged, there is little danger that the effectuation of state policy will destroy a privilege intended to be conferred by federal law." (Footnote omitted.)

risdiction even where the activities involved are arguably subject to NLRB jurisdiction: "[D]ue regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. . . . Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." Id. at 243, 79 S. Ct. at 779.

Writing for the majority in Beauharnais, Justice FRANKFURTER (the writer of Garmon) said in reference to an Illinois statute: "Moreover, the [Illinois] Supreme Court's characterization of the words prohibited by the statute as those 'liable to cause violence and disorder' paraphrases the traditional justification for punishing libels criminally, namely their 'tendency to cause breach of the peace.' " Id. at 254, 72 S. Ct. at 729.

Justice FRANKFURTER went on to reiterate that: " 'There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not

in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." ' " Id. at 255-57, 72 S. Ct. at 730-31.[11]

The clear and historically concerned interest of the state in providing a peaceful forum to which individuals whose reputations have been damaged by false and injurious statements can bring their claims should not be frustrated in the absence of a clear expression of congressional intent.[12]   Our review of legislative his-

---

[11] In *Blum v. Int'l Ass'n of Machinists*, supra note 9, Mr. Justice FRANCIS, writing for a three justice minority of the Supreme Court of New Jersey, recently re-emphasized the remarkably persuasive decisional premise of Mr. Justice FRANKFURTER in *Beauharnais*. Justice FRANCIS wrote: "Libel is a crime at common law. It became such primarily because of its potentiality for incitement to violence and consequent breach of the peace. . . . [H]uman nature has not changed very much and the capacity of defamatory writings to incite violence remains with us. Therefore, I believe that if damage actions based on violence on the part of an employer or union are not considered withdrawn from the jurisdictional competence of the state courts, such actions based on libelous utterances on the part of either group, the tendency of which is to trigger violence, ought to be left to the state sovereignty as well. I can see nothing in the language of the Labor Management Relations Act which preempts the one and leaves us the other." 42 N.J. at 404, 406, 201 A. 2d at 54-55.

See also, Blackstone's Commentaries 813 (Gavit ed. 1941) ("The direct tendency of these libels is the breach of public peace, by stirring up the objects of them to revenge and perhaps to bloodshed.").

[12] The maintenance of peace as a purpose for civil actions of libel has recently been recognized by the Supreme Court of the United States. *Garrison v. Louisiana*, 379 U.S. 64, 70, 85 S. Ct. 209, 213 (1964). See also Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 924 (1963).

The danger in libel is different from that nebulous danger involved where a state attempts to restrict one person's action because it may be generally disliked by another person. Cf. *Edwards v. South Carolina*, 372 U.S. 229, 83 S. Ct. 680 (1963). In a

tory reveals no such express intent, nor can we find any such implicit necessity. We should especially protect the significant state interest where the "slight social value" of the utterances "as a step to truth" is so clearly out-weighed by countervailing, meaningful social interests.[13]

Nor would the forum provided by the NLRB adequately protect the state interest involved since libelous utterances may frequently be regarded as immaterial or insignificant in relation to the labor issues involved, and, therefore, may not motivate the NLRB to set aside an election. A deep-seated state interest should not be withdrawn from state jurisdiction by virtue of such extremely peripheral labor activity.[14]

---

libel case the danger is real since, by defamation, one person literally attacks another's reputation. There is direct conflict and effrontery.

[13] In many respects, libelous use of material here is similar to a smear campaign in an election for public office. In neither instance is there a purposeful social or public need to encourage such irrelevant and harmful activity by granting absolute protection against deliberate libel at the expense of fundamental state interests by withdrawing state jurisdiction so that intentional libel may be privileged and unrestrained. It is inconceivable that so vital a state interest should be destroyed and its citizens afforded no protection against intentional libel in the absence of clear congressional mandate to that effect.

[14] The extent to which such utterances are peripheral to Board concerns is illustrated by the complete insignificance of defamation, as such, in Board determinations to set aside elections.

"The Board has long made it clear that it will not 'police or censor propaganda used in the elections it conducts, but rather leaves to the good sense of the voters the appraisal of such matters, and to opposing parties the task of correcting inaccurate and untruthful statements.' Nevertheless, elections have been set aside 'because of material misrepresentations of fact where (1) the employees would tend to give particular weight to the misrepresentation because it came from a party that had special knowledge of, or was in an authoritative position to know, the true facts and (2) no other party had sufficient opportunity to correct the mis-

We have said that the activity involved in this case is peripheral to the labor dispute. In fact, in entertaining suits for libel, our courts deal with an interest completely different from that with which the NLRB deals. The NLRB is not interested in protecting reputation, or in deterring violence. Its concern is with insuring that an employee's right of free choice is not interfered with by coercion, falsehood or emotion.[15] On the other hand, the state jurisdiction is not directed at regulation of labor relations as such. The state concern is with injury to reputation and the discouragement of violent reprisals.[16] The fact that a labor dispute is involved in this case is really a fortuitous circumstance.[17] In our view, these factors are quite significant.[18]

representation before the election.'" (Footnote omitted.) Bok, The Regulation of Campaign Tactics in Representation Elections Under The National Labor Relations Act, 78 Harv. L. Rev. 38, 82 (1964).

[15] This accounts for the Board's policies set out by Bok, note 14, supra.

[16] It is in this respect that we believe that reliance which the court of appeals in *Linn v. United Plant Guard Workers*, supra note 9, placed on *Local 100, United Ass'n of Journeymen v. Borden*, 373 U.S. 690, 83 S. Ct. 1423 (1963), and *Local 207, Int'l Ass'n of Bridge Workers v. Perko*, 373 U.S. 701, 83 S. Ct. 1429 (1963), is inapposite. In both these cases the state was attempting to protect a worker's interest in his job. This is obviously a matter of labor relations and is to be governed exclusively by federal law. In libel actions, however, the state is affording protection of a citizen's interest in his reputation. The fact that the reputation was injured in a labor dispute is merely incidental. In vindicating this compelling interest—an interest close to its police power—the state is not responding to considerations of labor policy at all.

[17] Cf. *De Veau v. Braisted*, 363 U.S. 144, 80 S. Ct. 1146 (1960) (upholding state attempt to regulate crime on the waterfront even though choice of labor representatives affected).

[18] We recognize that the mere fact that the present cause of action is *termed* one for libel is not decisive. However termed— whether a restraint-of-trade enactment, as in *Weber v. Anheuser-*

The right of an individual to be protected against injury inflicted by false and damaging statements is so fundamentally within the traditional province of state concern and responsibility that extended emphasis and discussion appear unnecessary. Surely, state administration of justice should not be denied on the basis of an inference or an assumption. Less than convincing congressional direction is insufficient to deprive the state of its important jurisdiction to offer a peaceful forum for redress.

We are unable to find any congressional action or intention, express or implied, which limits the power of the state to make effective its long expressed public policy of according litigants a peaceful forum for protection against libel. Especially is this true where, as here, the allegation is made that the libel was deliberate, malicious and made with actual intent to harm.

It is also intriguing to note the consequences of the rule for which the defendants contend. Since the NLRB can offer no satisfactory redress to the individual for the harm caused in a labor controversy, participants in a labor dispute have, in effect, personal immunity from action for libel. Our federal constitu-

_Busch, Inc._, 348 U.S. 468, 75 S. Ct. 480 (1955), and _Local 24, IBT v. Oliver_, 358 U.S. 283, 79 S. Ct. 297 (1959), or a general tort provision, as in _Garmon_—there is preemption if a state law is in practical application expressive of its resolution of conflicting policies regarding an issue in fact spoken to by federal legislation: concerted activities in support of a jurisdictional dispute in _Weber_, the scope of collective bargaining in _Oliver_, minority-union pressure for recognition in _Garmon_. Here, however, we have not merely a cause sounding in libel. As we have said, the right of action asserted reflects a wholly different set of interests, to which federal labor law has not addressed itself at all, and "since the very elements of the state cause of action will establish that the conduct is not federally privileged, there is little danger that the effectuation of state policy will destroy a privilege intended to be conferred by federal law." Michelman, supra note 10.

tion insures freedom of speech, yet it has always been held that freedom of speech is circumscribed by limits. Libel has traditionally been one of these limits. The furthest immunity from suits or prosecution for libel thus far granted is in regard to criticism made of governmental, public officials. See *New York Times v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710 (1964); *Garrison v. Louisiana,* 379 U.S. 64, 85 S. Ct. 209 (1964). And even this rule does not apply where the defamation is made with actual malice. Ibid. Since actual malice is alleged in the instant case, the holding which defendants seek would put them beyond even the pale of the *Times* ruling. We are not willing to grant to participants in labor disputes such absolute privileges on the basis of mere implication without any clear congressional indication—privileges which far outdistance a constitutional guarantee so jealously guarded and extended to its permissible social limit.

We recognize, of course, the guiding principle behind the doctrine of federal preemption: that where state and federal remedies may conflict and cause friction, the state jurisdiction must yield in the absence of a compelling state interest. A delicate balance exists between insuring effectuation of the federal policy embodied in congressional labor law and protecting permitted vital state interests. This is, of course, true where free speech in a labor dispute is involved. There is always some danger that criticism may be stifled if the balance is not precisely drawn, yet this is always true in placing defamation limitations on free speech. Abuses can be protected by the exercise of judicial authority. *Beauharnais v. Illinois,* supra, at 263-64, 72 S. Ct. at 734; *Salzhandler v. Caputo,* 316 F. 2d 445, 450 (2d Cir.), cert. denied, 375 U.S. 946, 84 S. Ct. 344 (1963).

Believing that a valid state interest which does not transgress federal policy exists in this defamation ac-

tion, we conclude that state jurisdiction has not been withdrawn.

## II

The trial court correctly dismissed defendants' preliminary objection which attacked plaintiffs' alleged failure to exhaust internal union remedies before seeking judicial relief. The court below held that plaintiffs' action for defamation is subject to, and controllable by, the courts rather than the constitution or by-laws of the union. *Falsetti v. U. No. 2026, U.M.W. A.,* 400 Pa. 145, 161 A. 2d 882 (1960), recognized that exceptions exist with respect to the rule regarding exhaustion of remedies and also recognized a relationship between that rule and the Labor-Management Reporting and Disclosure Act of 1959.[19]

In *Salzhandler v. Caputo,* 316 F. 2d 445 (2d Cir.), cert. denied, 375 U.S. 946, 84 S. Ct. 344 (1963), the Labor-Management Reporting and Disclosure Act of 1959 which protects freedom of expression for union members[20] was construed to prohibit union discipline with respect to a member who allegedly had made libelous statements about a union officer.[21] The union argued in support of its disciplinary sanctions, that

---

[19] Act of September 14, 1959, 73 Stat. 519, §1 et seq., 29 U.S.C. §401 et seq. (Supp. 1964).

[20] "Freedom of Speech and Assembly. Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions . . . ." Act of September 14, 1959, 73 Stat. 522, tit. I, §101(a)(2), 29 U.S.C. §411(a)(2) (Supp. 1964).

[21] "The Congress has decided that it is in the public interest that unions be democratically governed and toward that end that discussion should be free and untrammeled and that reprisals within the union for the expression of views should be prohibited." *Salzhandler v. Caputo,* 316 F. 2d 445, 451 (2d Cir.), cert. denied, 375 U.S. 946, 84 S. Ct. 344 (1963).

"just as constitutionally protected speech does not include libelous utterances, Beauharnais v. Illinois, . . . [supra], the speech protected by the statute likewise does not include libel and slander." 316 F. 2d at 449. The court of appeals, however, distinguished *Beauharnais,* stating that the Supreme Court of the United States in that case had sustained the punishment of libel by courts and not by unions,[22] and held that although "libelous statements may be made the basis of civil suit between those concerned, the union may not subject a member to any disciplinary action on a finding by its governing board that such statements are libelous."[23] 316 F. 2d at 451. Among the exceptions noted in *Falsetti* is that a person will not be required to take intra-association appeals which cannot, in fact,

---

[22] In explaining the difference between court action and union action, the court of appeals said: "In Beauharnais, the Supreme Court recognized the possibility that state action might stifle criticism under the guise of punishing libel. However, because it felt that abuses could be prevented by the exercise of judicial authority, . . . the court sustained a state criminal libel statute. But the union is not a political unit to whose disinterested tribunals an alleged defamer can look for an impartial review of his 'crime'. It is an economic action group, the success of which depends in large measure on a unity of purpose and sense of solidarity among its members.

"The [union] Trial Board in the instant case consisted of union officials, not judges. It was a group to which the delicate problems of truth or falsehood, privilege, and 'fair comment' were not familiar. Its procedure is peculiarly unsuited for drawing the fine line between criticism and defamation . . . ." (Footnote omitted.) 316 F. 2d at 449-50.

[23] "In reaching such a result the court could have further supported its reasoning by analogy to those obscenity cases in which a statute is struck down, not because the substantive standards are unconstitutional, but because initial administration of the standards is entrusted to a lay tribunal with insufficient concern for first amendment rights." (Footnote omitted.) 77 Harv. L. Rev. 770, 771 (1964).

yield remedies.[24] This exception is clearly applicable in the present case. This record is entirely free from even the slightest suggestion that any remedy—theoretical, token, illusory or otherwise—is in any manner available or provided by any internal union procedure.

Order affirmed.

Mr. Justice MUSMANNO dissents.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

In view of the lack of authority for the proposition that the state's interest in defamation is as great as the state's interest in physical violence, I prefer to follow the well reasoned federal and state authorities to the effect that state-based actions for defamation arising out of a labor dispute are precluded, because regulation of the conduct in question is subject to the exclusive primary jurisdiction of the National Labor Relations Board over unfair labor practices and representation elections. *Linn v. United Plant Guard Workers,* 337 F. 2d 68 (6th Cir. 1964); *Blum v. Int'l Ass'n of Machinists,* 42 N.J. 389, 201 A. 2d 46 (1964); *Hill v. Moe,* 367 P. 2d 739 (S. Ct. Alaska 1961), cert. den., 370 U.S. 916 (1962); *Warehouse & Produce Workers Local 559, IBT v. United States Gypsum Co.,* 50 C.C.H. Lab. Cas. ¶19,196 (Superior Ct. Wash. 1963); *Schnell Tool & Die Corp. v. United Steelworkers,* 200 N.E. 2d 727 (Ohio C.P. 1964). These cases are clearly within the spirit of the recent United States Supreme Court pronouncements on preemption of state tort actions arising out of labor disputes. See *Iron Workers Union v. Perko,* 373 U.S. 701 (1963) and *Local 100, United Association of Journeymen v. Borden,* 373 U.S. 690 (1963).

---

24 A similar conclusion was also reached, but for different reasons, in *Preveden v. Croatian Fraternal Union,* 120 F. Supp. 33 (W.D. Pa. 1954). The court there held that a member was not required to exhaust remedies provided by a fraternal union prior to bringing action for defamation.

While the reputation and character of employees and employers may not be the primary concern of the NLRB in defining the area of permissible speech in labor disputes, it is patent that the development of fifty state laws of defamation cannot adequately deal with the needs of free flow of communication in such disputes. The Commonwealth's interest in defamation in the course of labor disputes is not great enough to warrant submersion of the vital need for uniformity of federal regulation of labor relations. This is not merely a case of the Commonwealth's interest colliding with that of the federal government, for it is the Commonwealth, like all states, that reaps the benefit of sound labor relations.

Accordingly, I dissent.