Max Harry STETTNER et al., Plaintiffs,

v.

INTERNATIONAL PRINTING PRESS-
MEN AND ASSISTANTS' UNION OF
NORTH AMERICA et al., Defendants.

Civ. A. No. 2136.

United States District Court
E. D. Tennessee,
Northeastern Division.

Nov. 17, 1967.

Robert W. Ritchie, Knoxville, Tenn., for plaintiffs.

John S. McLellan, Kingsport, Tenn., for defendants.

## MEMORANDUM OPINION

NEESE, District Judge.

This is an action by four members of the subordinate local union of the defendant International Printing Pressmen and Assistants' Union of North America at Knoxville, Tennessee, to enjoin the defendants from moving the union's headquarters from Pressmen's Home, Tennessee, to Washington, D. C., and disposing, *inter alia*, of the real estate of a subsidiary corporation of the union at the former place. The individual defendants, who constitute the board of directors of that union, were ostensibly enabled to take these steps by an amendment to the union's constitution. The plaintiffs claim that the purported amendment was made unlawfully in violation of their political rights in the union, and is a nullity.

There is a general national policy against courts' interfering in internal disputes of trade unions, Calhoon v. Harvey (1964), 379 U.S. 134, 145, 85 S.Ct. 292, 13 L.Ed.2d 190, 197 (separate opinion of Mr. Justice Stewart). For that reason, this Court considers the merits of the dispute only to the extent deemed necessary to determine whether the rights of the plaintiffs under 29 U.S.C. § 411(a) were violated in the process of balloting within the union on the proposition of whether the union's constitution should be amended in the manner suggested; and if so, whether the extraordinary relief of injunction should be awarded the plaintiffs under the circumstances presented.

Before the apparent adoption of the amendment mentioned, the union's constitution provided that its headquarters must be permanently located at Pressmen's Home. The board of directors of the union initiated a proposition to amend that provision to permit the directors to select the site of its headquarters. The proposition was then submitted to a referendum vote of the members of the union. This balloting was conducted in some 750 local unions in the continental United States, Alaska and Canada. Local officers of each subordinate union returned certified results of the voting in the respective local elections to a board of electors of the international union. The aggregate of these returns reflected that the votes of 44,708 members of the union had been properly cast and certified, of which 24,544 favored the proposition and 20,164 opposed it. When no

complaints of irregularity in the voting in any local were received seasonably by officials of the union, they proceeded with steps in implementation of the will of the apparent plurality of 4,380 of their members.

After this litigation was instituted, union authorities took cognizance of complaints, although filed after the time prescribed in the union's constitution, that there were blatant irregularities in the balloting at the union's local no. 388 at Los Angeles. There, the returns certified reflected that 2,650 members of that local had voted, with 2,446 favoring the proposition and 204 opposing it. Finding that only 64 votes were registered in conformity with all the pertinent provisions of the union's constitution in the balloting at Los Angeles, these authorities disallowed all 2,650 votes.

The plaintiffs claim, it is conceded by the defendants, and the Court finds, that by far the greater majority of the balloting in other subordinate local unions located at Atlanta and New York City was also accomplished contrary to the plain provisions of the union's constitution. These nonconforming votes were counted by the union's board of electors and are included in the published tabulation of the final results, although the union's constitution specifically forbids the counting of such votes. About 1,884 unconforming votes appear to have been thus included. The certified returns of the results from these two locals showed 2,011 for and 114 against the proposition in the New York balloting and 1,079 for and 97 against in the voting at Atlanta.

Every member of this union was guaranteed equal rights and privileges to vote in this referendum " * * * subject to reasonable rules and regulations in such organization's constitution and bylaws. * * * " 29 U.S.C. § 411(a) (1). Plainly, this is no more than a command that members of this union must not have been discriminated against in their right to vote in the referendum involved. " * * * And Congress carefully prescribed that even this right against discrimination is 'subject to rea-

sonable rules and regulations' by the union. * * * " Calhoon v. Harvey, supra, 379 U.S. at 139, 85 S.Ct. at 295, 13 L.Ed.2d at 193–194. The crux of the matter, then, is whether there was discrimination against the plaintiffs' equality of rights and privileges in such voting.

■ It is undisputed that the plaintiffs cast their four respective votes against the proposition submitted, in conformity with the reasonable rules and regulations of the union's constitution and bylaws pertaining to balloting in referenda. It is now undisputed that many others of their fellow members cast their respective votes in favor of the proposition submitted, but not in conformity with such reasonable rules and regulations, and that these votes favoring the proposition were counted, contrary to the plain mandate of that document, along with the opposing votes of the plaintiffs. This Court concludes, therefore, that the negative votes of the plaintiffs were "killed" by the aforementioned improperly-cast positive votes; that the plaintiffs, accordingly, have been discriminated against; and that their rights under 29 U.S.C. § 411(a) (1) were infringed.

■ Federal courts will review the constitution and bylaws of a union where there is evidence that provisions therein " * * * are being applied in such a way as to deny equality in voting * *." Cf. Gurton v. Arons, C.A.2nd (1964), 339 F.2d 371, 374 [2]. The constitution and bylaws of this union constitute a contract between the union and its members and bind all its members alike. DeMille v. Am. Fed. of Radio Artists (1947), 31 Cal.2d 139, 187 P.2d 769, 175 A.L.R. 382, 389–390, certiorari denied (1948), 333 U.S. 876, 68 S.Ct. 906, 92 L.Ed. 1152, cited in Smith v. General Truck Drivers, Etc., Union Local 467, D.C.Cal. (1960), 181 F.Supp. 14, 17 [4]. Officer-members of a union are as subject to 29 U.S. C. § 411(a) (1) as are nonofficer-members of that union, the political rights guaranteed by this statute having been adopted to strengthen internal union de-

mocracy. Grand Lodge of International Ass'n of Machinists v. King, C.A.9th (1964), 335 F.2d 340, 344 [2], certiorari denied (1964), 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334.

■ The statute under consideration directed that all members of this union vote in this referendum in a particular manner, viz., in accordance with the reasonable rules and regulations in the union's constitution and bylaws applicable to such voting. A statute which directs that a thing be done in a particular manner ordinarily implies that it shall not be done in any other manner. Botany Worsted Mills v. United States (1929), 278 U.S. 282, 289, 49 S.Ct. 129, 73 L.Ed. 379, 385 (headnote 2); Raleigh & G. R. Co. v. Reid (1872), 13 Wall. [80 U.S.] 269, 270, 20 L.Ed. 570, 570–571. As observed hereinbefore, the plaintiffs voted against the proposition submitted as directed in 29 U.S.C. § 411(a) (1), while thousands of other members of their union voted for the proposition submitted in a manner not so directed. It can hardly be contended, in the light of deviations of such magnitude from the statutorily-required direction, that the equal rights and privileges of these plaintiffs to vote in this referendum have not been effectively diluted. Cf. Reynolds v. Sims (1964), 377 U.S. 533, 562, 84 S.Ct. 1362, 1382, 12 L.Ed.2d 506, 527.

■ The remaining question is whether this Court should, in view of these factual and legal conclusions, enjoin the defendants from proceeding to move the union's headquarters and sell its subsidiary's realty. This Court subscribes to the basic theory that courts should be hesitant to utilize this extreme device,

except in the face of a clear showing of its need. The holding of one Court of Appeals indicates that the answer should be in the negative. It was said:

" * * * The plaintiff has not been denied the right to vote and makes no claim based on any such denial. But he would have us construe the language of the statute [29 U.S.C. § 411(a) (1)] as granting authority to the federal courts to control and direct the entire conduct of union elections on the theory that the right to vote is a right to cast an 'effective' vote, and that a vote cannot be effective unless the election is properly conducted in all its aspects. * * * [W]e would be reluctant to hold that such a simple guaranty of the equal right to vote would carry with it the broad implications with which the plaintiff would freight it.[1] Surely if Congress intended the federal courts to assume a general supervision over the conduct of union elections it would express that intent in terms which are at the same time more specific and more general than are found in Section 101(a) (1) [29 U.S.C. § 411(a) (1)]. * * * " Robins v. Rarback, C.A.2nd (1963), 325 F.2d 929, 930 [2].

One of the three members of the panel of that Court declined to concur in this holding of his judicial brethren, because " * * * their construction of this important section of the 'Bill of Rights' title of the LMRDA[2] unduly constricts the right to vote that is therein guaranteed to union members." Ibid., 325 F.2d at 931 (concurring opinion). Circuit Judge Waterman, in pertinent part, wrote: " * * * I regard the Section 101(a) (1) voting right as being broad enough to protect union members from election

---

1. The plaintiff Robins sought an injunction restraining the union and its officers from " * * * permitting any person other than the voter himself to handle a completed or filled out ballot prior to its being placed in the ballot box and before the time of counting ballots cast; permitting ballots to be marked by voters in any union election in any booth or other place that is not fully enclosed, on all sides, by a wall or curtain; permitting any person to vote in a union election

without first subjecting his union book to examination by a proper election watcher, including the watcher or watchers appointed by opposition candidates; permitting any person to vote in a union election without first registering and producing identification. * * * " 325 F.2d at 930.

2. A reference to the Labor-Management Reporting and Disclosure Act of 1959, of which 29 U.S.C. § 411(a) (1) is a part.

practices which, if unchecked, would serve to render balloting at union elections a vain act. * * *

"If the right to vote guaranteed by Section 101(a) (1) is to be at all meaningful the section must be regarded as demanding more than a simple provision in a union's constitution or by-laws formally stating that all members are entitled to cast a ballot. The majority's interpretation of this section, if my assessment of it is correct, reduces the guarantee of the right to vote to little more than this. Presumably the majority might also permit judicial intervention when members are actually denied access to the polling place. But even such a denial when accompanied by some explanation on the part of the defendants as, for example, a claim that the plaintiff voter had failed to identify himself properly, might present problems of election procedure creating issues of voting rights which the majority would regard as being outside the proper province of a court to adjudicate.[2]

"2. [in original.] It is not difficult to think of election procedures that in a more roundabout fashion would serve effectively to bar members from a polling place. In Kolmonen v. International Hod Carriers' Union, 215 F.Supp. 703 [W.D.Mich.1963], the defendant union's members were scattered throughout the state of Michigan. The election procedures that were there attacked required all members who desired to vote to present themselves at the union's office in Detroit on a given day. This was found by the court to constitute a denial of the equal right to vote under § 101(a) (1), on the ground that the procedures discriminated against members living a substantial distance from that city. Id., 215 F.Supp. at 707. * * *

"* * * I * * * have difficulty with my brothers' intimation that federal judges should not correct union election abuses as Congress somehow believed interference designed to assure this type of fairness in union internal affairs required a measure of expertise not possessed by judges. To the contrary, the entire bundle of member rights guaranteed by Sections 101(a) (1) and 101(a) (2) are, according to those sections, subject to reasonable union rules and regulations, and Congress placed the responsibility for determining the reasonableness of such rules and regulations[3] squarely upon the courts. To me, this demonstrates that Congress had faith that the federal courts had vision enough to deal with the most vital questions that can arise from the administration by a union of its internal affairs. Indeed, even the task of determining the proper scope of the Section 101 rights themselves would seem to involve important considerations as to the legitimate conduct of a union's internal affairs. See Harvey v. Calhoon, 324 F.2d 486 (2 Cir., 1963)[4] (dealing with the right to nominate candidates); Salzhandler v. Caputo, 316 F.2d 445 (2 Cir. 1963), cert. denied [375 U.S. 945] 84 S.Ct. 344, [11 L.Ed.2d 275] (Dec. 9, 1963). * * * Therefore it is my belief that the determination of claims that a union's election practices operate to deny the union members the [equal] right to vote is not fraught with such peculiar problems as to place it beyond the legitimate scope of judicial inquiry.

"Accordingly, in my view, a court in this kind of case would ordinarily be obliged to consider in detail the allegations made in the union member's complaint in order to determine whether the election practices claimed to exist are such as effectively to disenfranchise union members. * * *" 325 F.2d 932–933.

The view of this Court comports with this construction expressed by Judge Waterman. Another district court had

---

3. This Court finds unnecessary to this adjudication a consideration of the reasonableness of the rules and regulations of the defendant union, especially that provision which permits its board of electors to disallow the properly, as well as the improperly, cast votes of an entire subordinate union.

4. The Supreme Court reversed the Court of Appeals for the Second Circuit in this case, but this does no violence to the point made by Judge Waterman in the instant context.

earlier expressed a similar view. " * * The defendants * * * claim that the enactment of section 101(a) (1) of the Landrum-Griffin Act has not put the courts into the business of enforcing rights granted by internal union law. However, it would appear to this Court that a plain reading of the Act in its Bill of Rights portion, as well as others, is a clear indication by Congress that the right to vote extended in the Act is not a mere naked right to cast a ballot. * * The Courts have said that by becoming a member of a union the worker, in effect, makes a contract to be governed by the constitution and by-laws and rules of the organization. Smith v. General Truck Drivers, etc., Union Local 467, D.C.S.D.Cal.1960, 181 F.Supp. 14.

"It would seem, therefore, that if the worker is to be held to what amounts to a contractual duty to adhere to the constitution, extreme care should be taken to make sure every procedural safeguard is provided him when amendments are proposed and submitted to the membership for vote, and thus insure adherence to union constitutional amending procedures. The opinion of the court in the cases of Hughes v. Local No. 11 of International Association of Bridge, Structural, and Ornamental Ironworkers, AFL–CIO, 3 Cir., 1960, 287 F.2d 810, 818, cited by the defendants, in no way alters this Court's opinion with respect to the safeguards that should be afforded the union members in amending the union constitution. * * *

"This Court finds the right to 'vote in * * * referendums * * * subject to reasonable rules and regulations in such organization's constitution and by-laws' is a right which is enforceable * * * by the membership against the defendants * * *." Young v. Hayes, D.C.D.C. (1961), 195 F.Supp. 911, 916–917 [3], 917 [4].

 Courts often enforce a union's constitution and bylaws in controversies between it and its members. United States v. White (1944), 322 U.S. 694,

701–702, 64 S.Ct. 1248, 88 L.Ed. 1542, 1548. Here, the statutory command that members of this union not be discriminated against in their right to vote in this referendum was made " * * * subject to reasonable rules and regulations * * * " contained in that very constitution. 29 U.S.C. § 411(a) (1). A statute conferring a right impliedly confers all the means necessary for the exercise of that right. Cunningham v. Neagle (1890), 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55, 77. A beneficent scheme of legislation was devised when the " * * Congress * * * decided that it is in the public interest that unions be democratically governed * * *." Salzhandler v. Caputo, C.A.2nd (1963), 316 F.2d 445, 451 [7], certiorari denied (1963), 375 U.S. 945, 946, 84 S.Ct. 344, 11 L.Ed.2d 275. When the balloting on this referendum [5] was conducted contrary to the plain provisions of the union's constitution, democracy in union government was thwarted and the plaintiffs were denied the means necessary for the exercise of their equal rights and privileges to vote in the referendum granted them by a beneficent law. Courts will not permit the " * * * wrongful use of a beneficent law * * *." Luria v. United States (1913), 231 U.S. 9, 24, 34 S.Ct. 10, 13, 58 L.Ed. 101, 106. Not only were the plaintiffs burdened with whatever disadvantages which may have burdened them by having any findings on discrimination against them under this statute made subject to the rules and regulations of their union, this proviso granted them also the advantage of having the balloting conducted in accordance with those rules and regulations. Cf. State Revenue Commission v. Columbus Bank & Trust Co., C.A.Ga. (1935), 50 Ga.App. 486, 178 S.E. 463.

 The activities of the defendants, presently restrained by agreement of the litigants under this Court's order of August, 1967, depend for their legality on whether the union's constitution has been validly amended. " * * *

---

5. This was the first use by the union of so-called chapel elections, following the adoption by its 1964 convention of the principle of "one-man, one-vote".

Duly elected union officers have no authority to do or sanction anything other than that which the union may lawfully do * * *." United States v. White, supra, 322 U.S. at 702, 64 S.Ct. at 1252, 88 L.Ed. at 1548.

The ultimate outcome of the balloting on the proposition is in doubt. Deviations from the union's rules and regulations in the balloting on the enabling proposition are shown to have resulted in a substantial dilution of the plaintiffs' equal political rights within their union. The discrimination against them is of such magnitude as to amount to invidiousness per se, Kilgarlin v. Martin, D.C.Tex. (1966), 252 F.Supp. 404, 415 [12] (3), requiring the fashioning of an appropriate judicial remedy, see Bush v. Martin, D.C.Tex. (1963), 224 F.Supp. 499, 511, IV, judgment affirmed (1964), 376 U.S. 322, 84 S.Ct. 709, 11 L.Ed.2d 656.

This Court finds it unnecessary in the protection of the plaintiffs' aforedescribed rights to further invade the province of the union, and so abstains from an adjudication of whether any part or all of the votes cast in chapel elections at New York City and Atlanta are to be allowed or disallowed. The Court abstains further from an adjudication of whether a majority of the union's members who voted in the referendum of April 19, 1967 favored or opposed the proposition submitted to amend the union's constitution so as to permit removal of the union's headquarters from Pressmen's Home and a disposition by its subsidiary corporation of realty there situated. Determination of these matters addresses itself to the union. The Court's sole duty relates to protecting and preserving the equal political rights in their union of the plaintiffs.

In so far as this record shows, the individual defendants had no notice of irregularity in the balloting at Los Angeles until the commencement of this action. Reaction by the union's board of electors was quick and positive in disallowing all 2,650 votes from that local after the hearings herein of August 18 and October 12, 1967. Until the defendants Messrs. DeAndrade and Rohan, members of that board, heard in court on October 30–31, 1967, revelations that nearly 1,900 additional votes had been cast in a manner directly contravening the rules and regulations of the union relating to chapel voting, it does not appear that any international elector knew of additional irregularities in the voting at Atlanta or New York. Indeed, with the exception of the defendant Mr. McCaughon, and until Messrs. DeAndrade and Rohan permitted the counting of the aforementioned 1,900 votes to stand uncorrected directly in contravention of pertinent rules and regulations of the union, there had been no hint from the outset of this dispute that the individual defendants committed any untoward act whatever.

Whether the proposition balloted upon passed or failed, invidious discrimination was practiced on these particular plaintiffs in the infringement of their rights under 29 U.S.C. § 411(a) (1), supra. While 1,900 questionable chapel votes are included in the tabulation of the aggregate voting on the enabling proposition, the inequality of voting in the referendum remains patent. Without the authority of the ostensible amendment to the union's constitution, the defendants cannot proceed lawfully. Again, the resolution of this dilemma addresses itself to the union.

It is sufficient for the present, at least, for this Court to embrace the plaintiffs within its strong arm of equity by its protecting, preventative process of injunction, to avert their further injury, which is impending and can only be thus prevented. The Court finds that the right of the plaintiffs to such relief is clear, the injury impends, and courts of law cannot afford the plaintiffs an adequate or commensurate remedy in damages. Bonaparte v. Camden & A. R. Co., C.C.N.J. (1830), 3 Fed.Cas. p. 821, No. 1,617 (opinion by the late Mr. Justice Baldwin, sitting as a circuit judge).

An appropriate order is being entered, the effect of which is to restrain the de-

fendants from moving the union's headquarters from Pressmen's Home, and from making any conveyance of the real property of its subsidiary corporation unless and until the individual defendants satisfy this Court that they are properly authorized so to do. Other matters of complaint and defense have been considered and may be safely, and are, pretermitted. Compensation for the special master is also being fixed.