Herman REKANT

v.

SHOCHTAY–GASOS UNION, LOCAL 446 OF the AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA.

Civ. A. No. 28346.

United States District Court
E. D. Pennsylvania.

May 22, 1962.

Henry B. Fitzpatrick, Jr., of Broderick & Fitzpatrick, Philadelphia, Pa., for plaintiff.

Edward Davis, Philadelphia, Pa., for defendant.

FREEDMAN, District Judge.

This is a suit under the Labor-Management Reporting and Disclosure Act of 1959, popularly known as the Landrum-Griffin Act (29 U.S.C.A. § 401 et seq.). A motion by defendant to dismiss and for summary judgment before trial was denied by Judge Grim: Rekant v. Shochtay-Gasos Union, 194 F.Supp. 187 (E.D. Pa.1961). The case is now before us for decision after a full and lengthy trial, at which a number of additional defenses as well as those originally raised were earnestly pressed.

Plaintiff is a shochet, a kosher slaughterer. He is a member of the Union, and his membership has continued despite his controversy with it. His fellow members in the local Union are all shochtim.[1] The shochtim work in a few local slaughter houses which observe the ritual slaughtering requirements for kosher meat. The relationship among the shochtim is heavy with the flavor of the old world and is even reminiscent of medieval guilds. The senior shochtim seem to have a kind of ownership in their job rights with a particular slaughter house, which permits them to select the junior shoctim who are to work with them. The senior shochtim's "rights" apparently are the subject of informal transfer and sale, somewhat like incorporeal hereditaments. In addition to the ordinary membership in a Union there is thus present here the fellowship of participation in a traditional activity. And it is an activity which is steeped in the pervasive element of the maintenance of a hallowed religious custom. Indeed, superimposed above the shochtim is the requirement that their work meet the approval of the Board of Orthodox Rabbis.[2]

The Union holds meetings and keeps minutes.[3] Its proceedings indicate a fine regard for parliamentary procedure.

At a meeting of the Executive Board of the Union on November 22, 1959 a resolution was adopted that three days work would be shared each week with the plaintiff, who had just lost his job.[4] Here, in the formal act in the name of

1. "Shochtim" is the plural of "shochet".

2. For a manifestation of this supervisory dominion see the letter from the Rabbinical Group for Supervision of Slaughter Houses in Philadelphia, calling upon the plaintiff not to resort to litigation. (N.T. 332.)

3. Minutes are kept in Yiddish, and the actions relevant to this case appear in the record in translation.

4. "Brother Rekant was called in, and Brother Schachter transmitted in a few words that which had transpired and says to him that all of the shochtim members have voluntarily or willingly decided to get or create three days' work for him in the slaughtering houses. This they do not because they want to and think that he is entitled thereto, only out of pity, and they voluntarily decide to give him another opportunity to see whether he can perform the work. Brother Rekant then answered, and again there ensued heated words, and the president closed the meeting." (Minutes, N.T. 248–249.)

a Union are overtones of a religious or at least fraternal fellowship. But it is met by an insistence on the part of the plaintiff which indicates at least on his part a belief in a "right" to such treatment. At any rate, the shochtim with whom the plaintiff was thus to share work, later felt that he had let them down because he failed to appear punctually and otherwise was unable to perform satisfactorily the work that was given to him. As a result there was brought before a general membership meeting of the Union on November 30, 1959 a resolution to withdraw the resolution of the Executive Board. Although it was fully debated, a vote on the resolution was postponed to a later meeting because of plaintiff's absence. At the regular meeting of the general membership on February 1, 1960 the plaintiff was present and the matter was again debated. If we may fill in the gaps between the lines of the Union minutes by recalling plaintiff's demeanor during the lengthy trial, we may readily believe that he made his views known with force and eloquence. *He was not, however, given written specific charges or any time to prepare his defense.* A resolution was adopted which rescinded the earlier one to share work with him.[5]

Plaintiff claims that this resolution withdrawing the prior one to share work with him was a disciplinary action by a Union, effected without adequate prior notice and without specific written charges. He claims, therefore, that it constituted a denial of rights guaranteed by § 101(a) (5) of the Labor-Management Reporting and Disclosure Act (29

U.S.C.A. § 411(a) (5)). The section provides: "No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." The remedy for the vindication of such rights is provided by § 102 of the Act: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. * * " (29 U.S.C.A. § 412.)

So there is brought before us the question whether these old-worldly practitioners of an ancient religious custom, in their dealing with one of their fellows violated an Act of Congress adopted to remedy widely recognized evils in trade union management.

■ In order for plaintiff to succeed (1) the action of which he complains must have been taken by the Union; (2) it must have been disciplinary in nature; (3) it must have been done without the required statutory notice; (4) plaintiff must have exhausted his internal union remedies; and (5) the jurisdiction of the National Labor Relations Board must not have pre-empted the jurisdiction of this Court.

We shall consider these problems separately.

5. "Mr. Miller now speaks. All of the minutes are full of Rekant. He wants work, and at a time when he can't do the work. Various plans have been worked out through this union in order to give him the opportunity to learn the work, but immediately he would say that he already knows it. But the truth is he himself tells that he does not know the work. We don't have a school where he can learn it. Therefore, he proposes that a resolution of the executives to give him two or three days' work a week should be withdrawn. Also, the resolu-

tion shall be withdrawn because of his constant unfriendly attitude to the union and because of his untrustworthiness, unfriendly conduct. It was decided to take Mr. Miller's motion to a secret ballot." (Minutes, N.T. 265.)

The resolution did not specify which men were to give up their work. This was left to Israel Rabinowitz, the president, to determine. He was to rotate the sharing of work as had been the practice in the past in similar situations. (N.T. 358.)

1. The defendant is a Local, a subordinate member of an International Union. The International has an elaborate constitution and by-laws, which are binding on the Local. (N.T. 217.) The Local has entered into collective bargaining agreements with kosher slaughter houses (N.T. 293, 363, 364; Exhibit D–5, Art. III.) Under the circumstances, defendant has all the characteristics of a labor union and its essential nature is not altered because its members perform a religious rite in their work. Certainly the members of the Union in their work for the slaughter houses are governed by the collective bargaining agreements, and in performing it are engaged in an occupation for hire even though its nature is such that it must fulfill certain religiously ordained requirements.

Another aspect of the problem is whether the resolution of February 1, 1960 rescinding the earlier resolution to share work with plaintiff was the act of the Union itself or only of those individual members who were to share their work with him. The withdrawing resolution was adopted at a meeting of the Union membership. It might not have affected all the members because all of them might not have been called upon to share their work with plaintiff. But it potentially affected all the shochtim. It may and, indeed, appears to have been motivated to a substantial degree by feelings of fellowship and responsibility towards any one of their number who had lost employment. But there is not enough in these circumstances to justify our ignoring the fundamental nature of the decisions made. The resolution to share work was adopted after full debate among the members of the Executive Board. The subject of withdrawing the work-sharing resolution was postponed at the meeting of the Union held on November 30, 1959 because plaintiff was absent. At the subsequent meeting of February 1, 1960 the same resolution was presented, debated and approved by the vote of the Union membership itself.[6] The resolutions were recorded as acts of the Union. At the same Executive Board Meeting on November 22, 1959 another member's circumstances were reported and the minutes indicate that aid was considered in the form of taxing the members or by sharing work. (N.T. 248.) This again indicates collective, organized action. And the decisions regarding the plaintiff were taken in the language of Union action, albeit considerations of generosity motivated the members.

We hold, therefore, that the share-the-work resolution of November 22, 1959 was in fact as it was in form an act of the Union and that the subsequent resolution of February 1, 1960 rescinding it likewise was in fact as it was in form an act of the Union. To hold otherwise would be to declare that all who debated these resolutions, as recorded in the detailed minutes, were transacting individual business even while they were acting within the Union framework.

2. Section 101(a) (5) is applicable only if the member is "fined, suspended, expelled, or otherwise disciplined". The Union contends that the revocation of the earlier resolution to share work does not fall within the language of the statute. It argues that the words "otherwise disciplined" are to be restricted on the principle of *ejusdem generis* to some modified kind of suspension or expulsion from membership.[7] We do not agree. We believe the words have a readily understood meaning. They apply whenever discipline is imposed on a Union member in any manner other than by an act of suspension or of complete severance of membership. The sharing of work was the only way in which the plaintiff could obtain employment at the time the resolution was adopted. Its withdrawal closed that door. Even on

---

6. The result of the ballot was 11 votes to withdraw the resolution, 4 not to withdraw it, 2 abstentions, and 2 void votes.

There were 19 members present in all. (N.T. 265.)

7. A fine, of course, is not here involved.

the Union's interpretation of the resolution it meant, at the very least, that the act of generosity reflected in the earlier share-the-work resolution was now being revoked and plaintiff would no longer be its beneficiary. The Union's reason was that he had proven unworthy of generosity and, indeed, unable to perform his work in a reasonably adequate manner. But however justified the reason, it was revoked for what the Union considered proper cause and both sides viewed the action as closing off an area of employment that had been opened up for him.

The Union also argues that the resolution was not a disciplinary act because it was no more than the withdrawal of an earlier resolution and, indeed, of a resolution not yet made final by approval of the general membership. We deal here, however, with substance and not with technicalities of form. The resolution of the Executive Board was in fact final; indeed, its finality is shown by its having been put into actual operation.

Whether the action was disciplinary in nature is to be determined by its practical effect. By the act of the Union, plaintiff lost his then existing right to share work. This was of immediate consequence to him, and it was a disciplinary act. Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2d Cir. 1961) cert. denied 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388, affirming 189 F.Supp. 573 (S.D.N.Y.1960), where the Union's action in placing plaintiff's name on an unfair list was held to constitute disciplinary action within the meaning of § 101(a) (5).

3. It is undisputed that plaintiff received no written specific charges of the conduct for which he was disciplined at the meeting of the general membership on February 1, 1960. In this the Union failed to comply with the statutory requirement.

While it may well be that a highly articulate and intelligent plaintiff fought against the resolution, nevertheless we have no right, without any factual warrant, to draw the unrealistic conclusion that the lack of notice of written specific charges and of a reasonable time to prepare his defense were of no moment to him. Indeed, the evidence is to the contrary. Plaintiff testified to a heated dispute at the meeting in which he took issue on some of the factual complaints made against him. (N.T. 52–53.) He testified that he had no opportunity to bring witnesses to support his denial at the meeting and had no chance to defend himself as he thought he might have done. (N.T. 52.) If, therefore, a factual finding of injury by the denial of the statutory right were a prerequisite to its maintenance we would unhesitatingly so find. However unintentional it may have been, plaintiff was denied what we may call statutory due process. This requirement would be frittered away if his mere attendance and participation at the meeting were to excuse its violation, without any showing that he had without notice put up his best defense. A "bill of rights" provision requiring due process and manifestly based on high considerations of public policy intended to protect individuals from group oppression should not be deemed to be waived—even if it could be waived—without evidence, affirmative and clear, which would justify such a finding. There is no such evidence here.

We conclude, therefore, that plaintiff was "otherwise disciplined" by the resolution of February 1, 1960 in violation of § 101(a) (5) of the Act.

4. Section 101(a) (4) contains a proviso that " * * * any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof * * * ".

The constitution of the International, which was applicable to the Local and was in effect on February 1, 1960, contained no provision for an appeal by a member from the decision of the general membership. It did provide for an appeal to the International Executive Board from the decision of the Local's Executive Board.

The disciplinary action of February 1, 1960 was taken by the general membership of the Local and not by its Executive Board. The internal regulations of the Union therefore made no provision for an appeal. Nor was there a provision requiring exhaustion of remedies within the Union prior to any legal proceedings. Nevertheless, plaintiff did attempt to appeal. After some correspondence with the Secretary and later with the President of the International, plaintiff's attorney was informed by the President of the International that if he felt aggrieved he should file charges against the individual officer or member of the Local of whom he complained.[8]

Clearly, therefore, plaintiff had no remedy available to him, yet he sought an appeal through the International's President and Secretary and was effectively denied it.

Defendant seeks to make applicable the provisions of a new constitution and by-laws adopted by the International some time in July 1960, effective July 1, 1960. We hold the provision of the new constitution and by-laws inapplicable because they were not in effect or, indeed, even adopted until more than four months after the disciplinary action was taken on February 1, 1960. Even if they could be made retrospectively applicable to the disciplinary action which had already been taken, the time which they prescribed for appeal had already gone by when they were adopted. Section 101(a) (4) indicates that four months is ample time within which a Union must provide internal relief. Here there was no relief provided the plaintiff by the Union's constitution and by-laws at the time the act of discipline was imposed, and it was more than four months thereafter that a prospective remedy was first established. The fact that plaintiff's suit was not brought until July 28, 1960, shortly after the new constitution went into effect, is of no significance. By that time his right to sue already existed. The Act makes it clear that even where remedies are available they must be sufficiently swift that no injustice will be done by requiring that they be exhausted before resort is had to outside relief, and the four months period expresses the Congressional view of what is a reasonable time.[9]

5. We are led, then, to the fundamental question of the proper role of federal courts in an area in which Congress has hitherto manifested a clear intention that the national labor policy be defined and administered by the National Labor Relations Board.

Prior to the adoption of the Labor-Management Reporting and Disclosure Act of 1959, great difficulty was experienced in drawing the boundary line between the sovereign power of the individual States on the one hand and of the

8. The International President's letter indicates a confusion between the right of appeal by a plaintiff from an action against him, and the right of appeal by an officer or member of the Union against whom plaintiff might, in accordance with the President's suggestion, have filed a charge. The President's letter reads:

"In your letter of May 13, 1960, you indicated that it was the feeling of Brother Herman Rekant that he has been aggrieved by some action of the membership of Local 466.

"This International Union is guided by the principle of Local autonomy and that each local union is, through its membership, entitled to make its own determinations and decisions. If Brother Rekant believes that any provisions of the Constitution of the International Union have been violated in connection with this mat-

ter, then written charges should be filed against the officer or member of the local union who has committed such acts. After a full and fair hearing upon such charges, the decision of the local union is subject to appeal to the International Executive Board.

"It is such a hearing upon charges which I was referring to, in the event written charges are filed by your client." (Exhibit P-6.)

Plaintiff had early written to the Secretary of International, who referred his letter to the President. (Exhibit P-2.)

9. Detroy v. American Guild of Variety Artists, 286 F.2d 75, 78 (2d Cir. 1961), cert. denied 366 U.S. 929, 81 S.Ct. 1650, 6 L. Ed.2d 388; Deluhery v. Marine Cooks and Stewards Union, D.C., 199 F.Supp. 270 (S.D.Cal.1961).

National Labor Relations Board in the enforcement of a nationwide labor policy, on the other.[10] The question before us is a narrower one. It concerns two organs of the same sovereign power: the federal courts and the federal administrative agency. Presumably, with full knowledge of the decisions of the Supreme Court, Congress expressly conferred upon federal district courts the authority to vindicate in " * * * a civil action * * * for such relief (including injunctions) as may be appropriate", the "bill of rights" provisions by which it guaranteed to all union members the right to receive specific written charges, a reasonable time to prepare a defense, and a full and fair hearing, before the imposition of an act of discipline. It may be that Congress considered interference with administrative expertise to be less of an evil where the interposing tribunal is a federal court rather than a state court because of the single nationwide federal sovereignty. Manifestly there would still be lost at least a substantial part of the advantage of having the national labor policy worked out by an expert administrative agency.

The conflict between the provision of the judicial remedy and the policy which favors the use of the expert administrative agency is sharpened by the facts before us. After the disciplinary act of February 1, 1960, plaintiff on May 19, 1960, filed a charge against the Union with the National Labor Relations Board (Exhibit D-1). Therein he complained that following the resolution of February 1, 1960 the Union had failed to send him out on jobs. He complained also of other conduct of the Union which affected his seniority rights. *But he made no complaint of the violation of statutory due process.* On July 29, 1960 the Regional Director refused to issue a complaint "because there was insufficient evidence of violation" of § 8 of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158. (Exhibit D-2.) From this decision plaintiff appealed to the office of the General Counsel of the National Labor Relations Board, which on October 4, 1960, sustained the ruling of the Regional Director. (Exhibit D-4.) Since no charge of violation of statutory due process was made or considered by the Board we have at the most a ruling of the administrative agency that plaintiff had failed to establish by evidence a charge of discrimination in employment. It is precisely what the Board decided that is not within the jurisdiction of this Court, and it is precisely what the Board did not decide and was not even called upon to decide that is expressly made the subject of the jurisdiction of this Court.

■ In these circumstances to hold that the federal courts have no jurisdiction to vindicate the procedural due process guaranteed by the "bill of rights" title of the Act would be to destroy a Congressional provision deliberately taken to meet what Congress deemed to be substantial evils. To meet these evils § 101(a) (5) was adopted, and by it Congress created a new, substantive right.[11] This is a federal right which was not within the competence of the National Labor Relations Board even in regard to unfair labor practices by a union against its own members.[11a] For the National Labor Management Relations Act of 1947, popularly known as the Taft-Hartley Act (29 U.S.C.A. § 141 et seq.), which for the first time made unions subject to proceedings before the Board for unfair labor practices against their members is limited to discrimination in employment. (See § 8(a) (3) (ii) (B); § 8(b) (2); 29 U.S.C.A. § 158.) The new right, outside the province of the National Labor

10. Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953); International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958); San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The Labor-Management Reporting and Disclosure Act of 1959 was adopted some months after the decision in Garmon.

11. See Robertson v. Banana Handlers International Longshoremen's Association, 183 F.Supp. 423 (E.D.La.1960).

11a. Ibid.

Relations Board, Congress expressly commanded by § 102 should be vindicated in the federal courts.

We do not consider the saving provisions of § 103 of the Act (29 U.S. C.A. § 413) as limiting the power conferred on federal courts by § 102 (29 U.S. C.A. § 412). On the contrary, § 103 clearly is intended to preserve rights or remedies theretofore inhering in a union member. This would make it clear that the rights and remedies provided by the Act are in addition to any which may theretofore have existed in favor of a union member, whether before a state or federal court or an administrative agency. By providing that theretofore existing rights and remedies were to be preserved Congress made the new statutory remedies cumulative in such circumstances. Where the new remedies were provided for newly-created substantive rights, no problem of conflict of remedies arises, and if the new remedies are not available the rights themselves are unenforceable. We may not say that even as it wrote § 101, creating the rights, and § 102, providing the remedies to vindicate them, Congress intended in § 103 to wipe them out.

We arrive then at the last consideration. Plaintiff is entitled to an injunction reinstating the status quo as it existed before the resolution of February 1, 1960 rescinding the earlier resolution to share work. But he is not satisfied with this. He seeks in addition damages for the loss of wages which he claims he would have earned if the rescinding resolution had not been adopted. We believe he seeks too much.

It is very clear from the record that plaintiff was a difficult member of the Union and an unsatisfactory employee. He luxuriated in controversy and warmed to strife. He taxed the patience of some of his fellow members to the point of despairing incomprehension. All this was visibly manifested during the trial. Although he viewed every unfavorable event as the shadow of a malign purpose, his own testimony justifies the conclusion that he is not competent to perform some of the more difficult work of a shochet. (N.T. 122.) He was, indeed, originally a poultry shochet, apparently a simpler form of slaughtering. (N.T. 4, 10, 13.) On a number of occasions when work was offered to him, he refused to take it. The record of his employment has more than one instance of loss of work for alleged incompetence or unsatisfactory performance. (N.T. 124, 314, 333.) It is clear beyond substantial dispute that his work was not satisfactory to his employers.[12]

We are led to the conclusion on a review of all of the evidence that although due process was denied plaintiff, he would not have obtained any other work beyond what was offered to him, even if the rescinding resolution had not been adopted. He would not have obtained it because his potential employers would not have accepted him as their employee. It is plaintiff who seeks damages. The clear burden was upon him to prove damages. We are not satisfied that he has sustained the burden. Hence we award him only nominal damages.

The statements of facts and of law in the foregoing Opinion shall be deemed to be findings of fact and conclusions of law. In addition we affirm plaintiff's requests for findings of fact nos. 2, 14, 15, 16 and 17, and plaintiff's requests for conclusions of law nos. 1, 2, 3, 4 and 7. We affirm defendant's requests for findings of fact nos. 1, 2, 4–6, incl., 8–15, incl., 22, 24–33, incl., and requests for conclusions of law nos. 1, 2 and 17.

All other requests by either party, to the extent that they have been implicitly affirmed in the course of the foregoing Opinion, are hereby affirmed; all other requests are severally denied.

### DECREE

AND NOW, May 22, 1962, the resolution of the defendant, Shochtay-Gasos

12. The superintendent of production at Cross Bros., the most important of the kosher slaughter houses, testified that they were completely dissatisfied with his work and would not permit him in their place. (N.T. 221–223.)

Union, Local 446 of the Amalgamated Meat Cutters and Butcher Workmen of North America, adopted on February 1, 1960, rescinding the resolution of November 22, 1959, to share work with plaintiff is declared null and void for want of written specific charges and a reasonable time to prepare his defense, and defendant, Shochtay-Gasos Union, Local 446 of the Amalgamated Meat Cutters and Butcher Workmen of North America, its officers, members, agents and employees, are enjoined and prohibited from doing or failing to do any act in reliance upon the rescinding resolution of February 1, 1960; and damages are awarded in favor of plaintiff and against defendant in the nominal amount of 6 cents.