Joseph P. KELSEY

v.

**PHILADELPHIA LOCAL 8, INTERNA-
TIONAL ALLIANCE OF THEATRI-
CAL STAGE EMPLOYEES et al.**

Civ. A. No. 42670.

United States District Court
E. D. Pennsylvania.

Dec. 23, 1968.

Edward B. Bergman, Solo, Abrams, Bergman, Trommer and Padova, Philadelphia, Pa., for plaintiff.

Kingsley Jarvis, John P. Hickey, Pittsburgh, Pa., for defendant.

## OPINION

HIGGINBOTHAM, District Judge.

This is a suit arising under the so-called "Union Member Bill of Rights" provision of the Labor-Management Reporting and Disclosure Act. Although it was originally before me on a request for a preliminary injunction, three hearings have been held and extensive briefs, memoranda and exhibits submitted, and both sides have agreed to have me treat the matter as one now for permanent injunction and final judgment. This opinion will serve as and in lieu of Findings of Fact and Conclusions of Law pursuant to Rule 52 F.R.Civ.Proc. For the reasons stated below, I find that plaintiff is entitled to substantially all of the relief he seeks.

### I.

Plaintiff, Joseph P. Kelsey, is a member of Local 8, International Alliance of Theatrical Stage Employees, defendant herein. In January, 1966, plaintiff was elected to a two year term as Vice President of the Local.

Defendant, Local 8, is a labor organization within the meaning of the Labor-Management Reporting and Disclosure Act,[1] with its principal office and place of business in Philadelphia, Pennsylvania. Its members are engaged in employment as Stagehands in theatres and other places of amusement and entertainment in Philadelphia.

For the purpose of referring its members for this employment, Local 8 runs a hiring hall, to which calls come from the operators of theatres and other places of amusement requesting the referral of men to work as stagehands. The secretary-treasurer has the primary responsibility for making such referrals. No written records are regularly kept of requests for men nor of what men are available and qualified for the various kinds of work at any given time. Availability, qualification and seniority, in that order, are supposed to be the factors determining who gets referred. However, because of the absence of records, responsibility for the decision of who gets assigned to a particular job is left solely to the knowledge and discretion of the secretary-treasurer.

The other principal officers of Local 8 are: John Wynn, President, and Harry Hockenberry, Business Representative.

1. 73 Stat. 519 (1959), 29 U.S.C.A. § 401 et seq. (1959).

These two men also have authority to make job assignments. The local has an executive board, consisting of four members, presided over by the union's president. Both the local and the international union have a constitution and by-laws.

The stagehand work is divided into three departments: carpentry, electricity and property. Each of these has a head of department and such assistants or "extra" men as needed for the particular job. The head of department receives a higher rate of pay and has supervisory responsibility for the work done by the extra men. Employment at most of the theatres and at Convention Hall is generally temporary, running for a period of from one performance to 12 to 14 weeks at a time.

Although the job as head of carpentry department at Convention Hall was, and is, an open job, i. e. one not permanently assigned to any particular person, from the beginning of February, 1966, through November, 1966, plaintiff was assigned to virtually every job as head of carpentry department there. This amounted to 36 assignments for which plaintiff earned approximately $2,701.50. Mr. Michael Sweeney was Secretary-Treasurer during this period. He was replaced by Raimund Sinker in November, 1966.

On November 19, 1966, Plaintiff, while employed as an extra man in the carpentry department at the Philadelphia Arena, was informed by union member Joseph Capparelli, then head of the carpentry department, that he was not going to work during the rehearsals. Thereupon, plaintiff got into an argument with President Wynn concerning failure to assign him to work.

On November 26, 1966, plaintiff went to the union office to discuss this failure to assign him with secretary-treasurer Sinker. The conversation began in normal tones of voice on both sides, and, at one point, Sinker stated that he might have made a mistake because of his inexperience at his job. The discussion, however, soon escalated into an argument and became quite boisterous—to the extent that Wynn came out from a back room to see what was taking place. It is the content of the verbal exchange between Kelsey and Sinker that formed the basis of the charges against Kelsey.

Sinker claims that Kelsey "threatened" him saying, "I will take you downstairs and fix you up. I will fight you."

Kelsey claims that Sinker came around from behind his desk, and, thinking that this was a threatening move on Sinker's part, he asked Sinker if he wished to go outside, presumably to fight, and thus intended no aggressive act himself.

As a result of this incident, on November 28, 1966, Sinker filed charges against Kelsey for "conduct un-becoming an officer," in that Kelsey allegedly threatened him with bodily harm trying to intimidate him.[2]

On December 3, 1966, Kelsey was informed that he was to appear before the union Executive Board on December 17 to answer these charges.[3] The notice also informed him that he was suspended from his official duties as vice president until after the trial and that he would "hold no head of department or stewardship" "or any other position of responsibility" during that period. At the trial, the executive board found Kelsey guilty of both[4] charges. This decision was ap-

---

2. Exhibit P–3c.

3. Exhibit P–3a.

4. President Wynn also filed charges based on the November 19th incident at the Arena. They were heard by the executive board at the same time as were the "Sinker" charges, and Kelsey was found guilty of those, too. The re-trial before the union membership, discussed infra, also concerned the "Wynn" charges, and again Kelsey was found guilty on both. He was sentenced only once, however, on the two convictions. On appeal to the International from the second conviction, the "Wynn" charges were thrown out for lack of evidence. Thus, they are moot with respect to this litigation.

proved by the membership on January 4, 1967.

Kelsey appealed to the International, and his appeal was sustained on several grounds, one of which was:

> The substance of the charges do not constitute grounds for the impeachment of officers within the meaning of Article VI, Section 1 of the Constitution. The charges in question come within the purview of Article VII, Section 1, providing for discipline of *members*. Under the provisions of this Article (Section 14), the accused has the right to demand a trial before the membership. (Emphasis supplied.)[5]

On March 23, 1967, the charges were re-filed, and on April 22, 1967, he was tried before the union membership and found guilty. He was sentenced pursuant to Article VII Section 23[6] of the Constitution, and Article XII Section 13 of the By-Laws[7] to:

1. Be fined fifty dollars;

2. Stand disfranchised from holding office or taking part in meetings for a period of one year from the date of the original charges, i. e., "the original penalty date";[8]

3. Be required to make an apology to the general membership at a regular meeting;

4. And be required to pay the cost of the transcript.[9]

Plaintiff appealed this conviction to the International, and on May 8, 1967 filed suit here under Section 101 and 102 of the Labor-Management Reporting and Disclosure Act,[10] having waited the requisite four months from the date of

---

5. Exhibit P–5, at 2.

6. Article VII, Section 23. Imposition of Penalties.

 "If the accused be found guilty of an offense for which no specific penalty is fixed by the Constitution and By-Laws, the Local shall then proceed to ballot upon the penalty. The vote shall be first upon the recommendation of the Board, which shall be adopted if a majority of the members present so vote. If the recommendations be rejected, then the Local shall proceed to ballot for the penalty to be imposed. The penalty shall be determined by ballot, the members voting to expel, suspend, fine, or reprimand."

7. Article XII, Section 13. "Any member intoxicated or acting disorderly around the theatres, office or meeting room shall be fined the sum of Fifty Dollars ($50.00) and stand disfranchised from holding office or taking part in the meetings for the period of one year; and shall also stand disfranchised from work until he appears before the next regular meeting and explains his actions to the members present."

8. Union transcript (Hereafter U. T.) p. 92.

9. U. T. at 95–96.

 While it does not appear in Article XII, Section 13, of the By-Laws, the requirement that Kelsey pay the cost of the transcript is consistent with Article VII, Section 19 of the union Constitution as interpreted by the International in their letter sustaining Kelsey's first appeal. (Exhibit, P–5.)

 On the other hand, while the union has continued, since December 3, 1966, to refuse to refer Kelsey for employment as head of department because of these charges, it was expressly stated that Kelsey's trial before the union membership that such refusal to refer Kelsey was not to be made a specific part of the penalty, but rather that it would be up to the men responsible for giving out the work to determine—"A problem encumbered [sic] upon them to exercise." Given the undeniable facts that the union men responsible for giving out work have "determined to exercise" their discretion not to refer Kelsey for work as head of department, and that such refusal is based on the incidents involved herein, as counsel for the union admitted in court (N.T. 116.), and it would seem clear that Kelsey is, by this refusal, being disciplined for the acts which formed the basis for the union charges. Thus it is within the protection of §§ 101(a) (2) and 102 of the Act. Detroy v. American Guild of Variety Artists, 286 F.2d 75, 81 (2d Cir., 1961) ; ReKant v. Shochtay-Gasos Union, Local 446 of Amalgamated Meat Cutters and Butcher Workmen of North America, 205 F.Supp. 284 (E.D. Pa.), rev'd on other grounds, 320 F.2d 271 (3d Cir., 1963).

10. 73 Stat. 522, 523, 29 U.S.C.A. §§ 411, 412.

the original imposition of the penalty.[11] While the matter was under consideration here, the International Union decided Kelsey's appeal, finding in his favor on the charges brought by President Wynn (hereinbefore the "Wynn" charges) and finding against him on the charges brought by Secretary-Treasurer Sinker (hereafter the "Sinker" charges.)[12] By letter to Kelsey, dated August 17, 1967, the International informed him of their decision as follows:

"On the basis of our findings, we modify the penalty as follows:

(1) The fine is reduced to $25.

(2) You are barred from holding office for a period of one year from March 23, 1967.

(3) You are assessed for one half of the cost of the stenographic minutes." [13]

## II.

The nub of the contentions of the parties around which the case revolves are as follows:

A. Plaintiff

1. The subject matter under "discussion" between Kelsey and Sinker at the time of the incident that generated the "Sinker" charges was of interest to the members of the local as members. Therefore, under § 101(a) (2) it was protected and Kelsey may not be disciplined regardless of the particular words used.

2. Alternatively, if the union can discipline a member for threatening another member or an officer with bodily harm, the legal determination of whether or not certain words and acts constituted such a threat is, ultimately, one on which the courts have the power to reverse the determination of the union.

B. Defendant

1. Threats are not protected by the Act, and the plaintiff's conduct at the Local's office constituted a threat against Mr. Sinker. His conduct is thus outside the protection of the Act.

2. The review by a court of the union proceedings is limited to determining whether the disciplined member had a full and fair hearing.

## III.

After careful consideration of the entire record, including the comprehensive briefs and oral arguments of counsel, I am of the opinion that the plaintiff is entitled to the relief he seeks —except insofar as he claims that he is entitled to be reinstated in the office of Vice President of the Local which he held at the time that charges were first brought. Since the term of office to which he was elected has expired, and he was not reelected, that claim is moot.

I am not unmindful of the policy, urged by counsel for the union, that the unions should have wide latitude to police their own internal operations free from the formalities of the courts, making use of the individual and collective knowledge and experience of the members regarding the tendencies and credibility of each other.

However, as the cases below point out, Congress has evidently felt that such unsupervised self-policing lend itself too readily to abuses by some at the expense of other individual members—usually the less popular and/or more outspoken. See, Lewis v. American Federation of

---

11. Section 101(a) (4) of the Act, 73 Stat. 522, 29 U.S.C.A. § 411(a) (4). The union approved the Executive Board's findings and sentence on January 4, 1967. However, Kelsey was subjected to the "discipline" from December 3, 1966. Using either date, Kelsey did wait the requisite four months. Moreover, unlike the plaintiffs in Harris v. International Longshoremen's Association, Local 1291, 321 F.2d 801 (3d Cir., 1963), Kelsey did pursue his intra-union remedies during this period as well as after the filing of this suit.

12. See N. 4, supra.

13. Exhibit P-11, at 2—See N. 9, supra.

State, County and Municipal Employees, 294 F.Supp. 834 (E.D.Pa., 1968). In view of the tremendous power which a union might wield—and in this case *does* wield—over the ability of a member to get or retain desirable work, and thereby to earn a living, it is not surprising the Congress sought to place stringent curbs on the union's ability to interfere with a union member's right and willingness to speak out against the management or conduct of the union. Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963); see Attleson, A Union Member's Right of Free Speech and Assembly v. Institutional Interests, 51 Minn.L.Rev. 403, 443, 449 (1967). In such instances, to allow the union's body to be the final arbiter of the facts, would undermine whatever protection Congress sought to provide for the outspoken, dissident member. *Salzhandler*, supra, 316 F.2d at 449–451; Farowitz v. Associated Musicians of Greater New York, 330 F.2d 999, 1001 (2d Cir., 1964).

In *Salzhandler*, plaintiff, the local's financial secretary, discovered, during a regular review of the union's accounts, what he believed to be evidence that the union president had appropriated several hundred dollars of union funds to his personal use. Subsequently, he prepared and distributed to the union membership leaflets accusing the union president of taking the money, and referring to him as a "petty robber."

The local's president promptly filed charges against Salzhandler accusing him of conduct detrimental to the interests of the Brotherhood, libeling and slandering a fellow officer and conduct inconsistent with the obligations of membership in the union. Following a full hearing, Salzhandler was found guilty and deprived of his office and suspended from participation in the union's affairs for a period of five years.

Salzhandler's suit in the federal district court under the L.M.R.D.A. was dismissed. The Court of Appeals for the Second Circuit reversed. The opinion stressed the importance of assuring the union members the right to speak out among the membership about conduct of the union officers thought to be improper or undesirable, and the fact that:

"* * * the union is not a political unit to whose disinterested tribunals an alleged defamer can look for an impartial review of his 'crime.' It is an economic action group, the success of which depends in a large measure on a unity of purpose and sense of solidarity among its members.

"The Trial Board in the instant case consisted of union officials, not judges. It was a group to which the delicate problems of truth or falsehood, privilege or 'fair comment' were not familiar. * * * " 316 F.2d 449–450.

"* * * The democratic and free expression of opinion in any group necessarily develops disagreements and divergent opinions. Freedom of expression would be stifled if those in power could claim that any charges against them were libelous and then proceed to discipline those responsible on a finding that the charges were false. * * * 316 F.2d at 451.

Certainly, as Judge Fullam of this court recently held, a federal district court may overturn a finding against a union member or charges brought by another member when they are completely lacking in evidentiary support. Lewis v. American Federation of State, County and Municipal Employees, 294 F.Supp. 834 (E.D.Pa., 1968).

In applying this holding to the instant facts I recognize that there are differences between "libels" and "threats" and that the latter term is much more widely thought to be of general usage and understanding, well within the layman's ability to discuss and apply. However where legal significance and the right to impinge on substantial individual rights are concerned, the characterization of what is or is not a threat has been held to involve considerations of the intent of the speaker, all of the circumstances in which the statement was made and even the reason-

ableness of the interpretation by the person addressed or allegedly threatened.[14] The determination and weighing of these factors to decide whether or not to discipline a member whose conduct would otherwise be protected by the Act, cannot, under the rationale of *Salzhandler* be left solely to the union.

The particular appropriateness of such a rule is demonstrated in the instant case by the fact that although Sinker charged that Kelsey had:

> "* * * threatened me with bodily harm, by telling me that he would take me outside the union office and fight me. Thus His trying to intimidate me, to bend to His will, by threats." ;[15]

the decision of the International, denying Kelsey's appeal from a conviction on these charges by the Local, stated:

> "With respect to the charges by Brother Sinker, we find that the evidence and testimony is sufficient to support the same. We note that, in effect, the accused admitted that he *invited* Brother Sinker to step outside presumably to attack *or fight* him on account of union business. Accordingly, the appeal from the conviction on these charges is denied."[16] (Emphasis added.)

Thus, for the International, Kelsey's "invitation" or expression of willingness to fight Sinker "on account of union business" rather than proof of a direct statement by Kelsey that he would hit Sinker unless Sinker complied with his demand was sufficient to constitute a "threat."

This difference is particularly significant in light of another aspect of the *Salzhandler* holding, which, I believe is the key to analyzing and applying the statutory language.

The district court, in *Salzhandler*, not only found that the union tribunal's determination was adequately supported by the facts; he went further and made an independent finding that the statements were in fact libelous. 316 F.2d at 448. The Court of Appeals, however, in reversing, neither found as a matter of law, that the statements were not libelous nor ordered a hearing by the district court to determine that narrow question. Consequently, the determination of whether or not the statements were or were not libelous must have been deemed to be irrelevant to the protection afforded the union member by the L. M. R. D. A. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers v. Rafferty, 348 F.2d 307 (9th Cir., 1965); Cole v. Hall, 339 F.2d 881 (2d Cir., 1965).

 What, then, are the limitations to the broad protection created by Congress for union members?

> "* * * The basic concern of the statute protecting union member's right to free speech is not in the precise words said, but rather in what was being talked about. If the underlying topic of conversation concerns union affairs then arguments, questions or accusations relating thereto are protected. * * *" Nix v. Fulton Lodge No. 2 of Intern. Ass'n of Machinists and Aerospace Workers, 262 F.Supp. 1000, 1005 (N.D.Ga., 1967).

> "* * * The essential purpose of the Act was to broaden, not to constrict, democratic safeguards for union members. * * *

> "The clear intent of Congress in enacting this legislation was to 'prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.' * * *

> "The Act was originally drafted and passed by the Senate with a freedom of speech section that was absolute. * * * By subsequent amend-

---

14. See United States v. Dutsch, 357 F.2d 331 (4th Cir., 1966); United States v. Daulong, 60 F.Supp. 235 (W.D.Pa., 1965); United States v. Charlick, 26 F. Supp. 203 (E.D.Pa., 1934) and Cote v. Murphy, 159 Pa. 420, 28 A. 190, 23 L.R. A. 135 (1894).

15. Exhibit P–3c.

16. Exhibit P–11, at 2.

ment, the only two express exceptions to absolute freedom from punishment for expression of opinion were added. * * * Graham v. Soloner, 220 F. Supp. 711, 714 (E.D.Pa., 1963).[17]

Where the statements forming the basis for the union's decision to discipline a member concern a matter of interest to the members of the union, in their capacity as members, they are protected by the Act. Once it has been established that the speech is protected, the member can be disciplined only where it is shown that the totality of his *conduct,* including, if it does, the statements:

> (1) is contrary to " * * * * the responsibility of every member toward the organization as an institution. * * * "

or (2) "Would interfere with its performance of its legal or contractual obligations." [18]

■ Plaintiff claims, and it is not, nor can it reasonably be, disputed, that the basic purpose of his conversation with Sinker was to discuss and to complain about Sinker's alleged failure—as the union officer responsible for job referral—to assign him to work at the Arena during the rehearsal and performance there on November 20, 1966. Who gets referred for what jobs, and by what procedure is a matter of the utmost importance to the members of a union that runs a hiring hall. Thus, this conversation between Kelsey and Sinker is squarely within the protection of the ba-

sic freedom of speech provision of the L.M.R.D.A.

■■ Even if I were to find Sinker's testimony 100% credible [19] the mere fact that Kelsey said "I will take you downstairs and fix you up. I will fight you," standing alone, does not bring his *conduct* within the proviso. Moreover, counsel for the union has not cited and I have not been able to find, any other evidence either in the record of the hearing before the union or in the record of the hearings before me from which I could reasonably conclude that Kelsey's conduct violated his "responsibility toward the organization as an institution * * * [nor how it] interfer[ed] with its performance of its legal and contractual obligations." The mere bald allegation that the conduct was "unbecoming an officer" or "detrimental to [the union's] purpose" is insufficient. *Salzhandler,* supra, 316 F.2d at 446; Stark v. Twin City Carpenters District Council, 219 F.Supp. 528, 532–533 (D.Minn., 1963); Farowitz v. Associated Musicians of Greater New York, 330 F.2d 999, 1001 (2d Cir., 1964); Lewis v. American Federation of State, County and Municipal Employees, 294 F.Supp. 834 (E.D.Pa., 1968).

## IV.

■ Since, as set out in footnote 9, supra, it is clear that Kelsey was disciplined because of his "conviction" by the union on the charges made by Sinker, and since that "conviction" was in violation of Kelsey's rights under § 101(a)

17. See also *Attleson,* supra at 459; Note: Free Speech, Fair Trial and Union Factionalism, 73 Yale L.J. 472, 475 (1964).

18. The exact language of the proviso to § 101(a) (2) is: *Provided,* that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

19. Mr. Sinker is obviously a sensitive and emotional man, whose emotion occasionally gets the better of him. It was this fac-

tor, I believe, rather than lack of candor, which prevented him from responding fully and precisely to some of the questions asked of him while he was on the witness stand. To what, if any, extent this affected his understanding and recollection of Kelsey's exact words and actions, including his statement in the hearing before me—which statement appears nowhere in the record of the intra-union proceedings, and therefore could not have formed part of the basis of the union's action—that Kelsey called him a God-damn Jew, I cannot say. However, for the reasons stated in this opinion, such determinations would not alter the outcome of this case, and thus, need not be considered.

(2) of the L.M.R.D.A., Kelsey is entitled to damages for any loss occasioned by such discipline and to an injunction against further imposition of any discipline as a result or because of that complaint and the proceedings arising therefrom.

Before going into further detail, I must point out that the decision of the union membership on December 2, 1967 (See Exhibit D 103 at 2–3) that "all Heads of Department jobs at * * * Convention Hall (* * * except Electrician * * *) are open jobs," is not dispositive since the testimony of former Secretary-Treasurer Michael Sweeney was that he regularly assigned Kelsey and the union's records show that in 1966 Kelsey was always assigned as head of the carpentry department at Convention Hall *despite the fact* that it was an "open" job.

The question of the measure of damages is difficult because of the lack of evidence. Initially, I cannot, for want of information, consider any claim with respect to assignments other than Convention Hall.,

██ Although several possible measures of plaintiff's damages have been suggested, I think that the most equitable is that which considers what he would have earned had he worked all of the available Convention Hall jobs as head carpenter [20] and reduces that by the amount he did earn at such times as he would otherwise have been working at Convention Hall plus the amount he failed to earn on such days because he was unavailable for work. That total for 1967 comes to $1,941.25.[21]

With regard to 1968, it must be remembered that the December, 1966 disciplinary order, precluded Kelsey's assignment as head of department for one year. On the other hand, although there is no direct testimony that the failure so to refer Kelsey in 1968 is attributable to the disciplinary proceedings or to his disagreement with Sinker in November, 1966, it is also true that it was the practice to refer him as head carpenter for *all* jobs at Convention Hall prior to that time, he has been referred to *no* such jobs continually since that incident, and Sinker, the person with whom Kelsey had the incident in November, 1966 is responsible for job referrals.

██ On balance, however, I cannot say that plaintiff has established by a preponderance that this incident of November, 1966 is the reason for the union's continued failure to refer him as head carpenter at Convention Hall. He is thus entitled to recover no damages for 1968.

██ Though plaintiff has not established that the illegal discipline against him is continuing at this time, it is not inappropriate to grant injunctive relief for past acts which have terminated.

I am in agreement with District Judge Duffy who in a labor injunction case said: "The abandonment of the practices found to be unlawful will not, per se, bar the issuance of the injunction. * * * The issuance of the injunction will depend upon whether the defendant's conduct in the past indicates a reasonable likelihood of further violations of the law in the future." Walling v. Builders' Veneer & Woodwork Co., 45 F.Supp. 808 (District Court, E.D.Wisconsin, 1942).

By reason of the patent capriciousness of the defendants' illegal acts and by reason of the fact that most of the same officers still continue in office, I find

---

20. Since the plaintiff did hold all such positions in 1966 prior to December 3, and no evidence has been introduced as to why, other than the judgment of the union tribunal herein question, he was not referred in 1967, it would seem fair and reasonable to assume that but for those proceedings he would have continued to be referred for all such jobs.

21. As to this, Kelsey's figure of $1,983.25 does seem inaccurate in its failure to take cognizance of his unavailability for work on January 21, 1967 due to a death in his family. As to the remainder of his figures, defendants have introduced no contrary evidence.

that there is a likelihood that similar arbitrary acts will be committed against plaintiff unless defendants are subject to legal restraint.

The injunction prayed for by plaintiff is therefore granted so that the November, 1966 incident which gave rise to the charges involved herein will no longer form the basis or any part of the basis, for disciplinary action against the plaintiff.

## ORDER

And now, this 23rd day of December, 1968, judgment is awarded in favor of plaintiff, Joseph P. Kelsey, and against defendant, Philadelphia Local 8, International Alliance of Theatrical Stage Employees, in the amount of $1,941.25 plus costs and interest from the date of this Order.

It is further Ordered that the defendants and each of them forever refrain from discriminating or in any way disciplining plaintiff, Joseph P. Kelsey, wholly or in part because of the incident of November 28, 1966, involving plaintiff and Raimund Sinker or the disciplinary proceedings arising therefrom.