**Raymond H. PAYNE, Plaintiff,**

v.

**UNITED ASSOCIATION OF JOURNEYMEN & APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRIES OF the UNITED STATES AND CANADA, et al., Defendants.**

Civ. A. No. CV88–PT–1696–S.

United States District Court,
N.D. Alabama, S.D.

May 4, 1989.

James Mendelsohn, Gordon Silberman Wiggins & Childs, Birmingham, Ala., for Raymond H. Payne.

Thomas N. Crawford, Jr., Frederick T. Kuykendall, III, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, Ala., for Local 91 et al.

Robert Matisoff (not admitted) O'Donoghue & O'Donoghue, Washington, D.C., for United Ass'n.

Richard E. Smith, Michael B. Maddox, Rives & Peterson, Birmingham, Ala., for Jefferson County Joint Apprenticeship Committee of Plumbing and Pipefitting Industry, Chester Smith, Harry I. Corley, Wayne Hamilton, L.F. Pierce, Jim Traywick, Homer Marlow, and Roy Johnston.

## MEMORANDUM OPINION

PROPST, District Judge.

This cause comes to be heard on (1) a Motion for Summary Judgment filed on March 13, 1989, by defendants Jefferson County Joint Apprenticeship Committee of the Plumbing and Pipe Fitting Industry ("JAC") and its trustees; (2) a Motion for Partial Summary Judgment filed on March 17, 1989, by defendant United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO

("UA"); and (3) a Motion for Summary Judgment filed on March 24, 1989, by defendant Local 91 of the U.A. ("Local 91").

As can best be culled from the pleadings, record, and briefs of the parties, the pertinent disputed and undisputed facts in this case are as follows:

Plaintiff began working in the pipefitting trade in 1982, when he paid dues to join Local 91 as a pre-apprentice. Prior to his formal enrollment in September of 1984 into the apprentice training program administered by defendant JAC, plaintiff had gotten three jobs by referrals from Local 91, accumulating two years and three months service. Plaintiff alleges that Local 91, through its Business Agent at that time, Hiram Vickers, "assured plaintiff that he would be granted credit for some of the time worked," thereby reducing plaintiff's period of apprenticeship. At the time of plaintiff's enrollment in the Joint Apprenticeship Training Program, the apprenticeship to become a journeyman was four (4) years.

Paragraph 10 of the Apprenticeship Standards pertaining to "Credit for Previous Experience" provides in pertinent part the following:

A. An applicant may request credit for previous experience. If the previous experience was outside the supervision of the JATC, the applicant must submit a request at the time of application and furnish such records, affidavits, or other bonafide evidence as the JATC shall require to substantiate the claims. *After candidates have signed the Apprenticeship Agreement, they cannot request an evaluation of previous experience.*
B. An apprentice who requests credit for previous experience shall be started at the beginning wage rate, and the request for credit shall be evaluated and a determination made by the JATC during the probationary period when actual on-the-job and related instruction performance can be examined.

Section 152(b) of the UA Constitution further provides that

(b) Apprentices shall serve a term of [four (4)] years in the trade, which shall consist of reasonably continuous employment during such term and include the probationary period and the required hours of supplemental related instruction. *Credit for previous experience, granted by the apprenticeship committee, shall be included as part of the [four (4)] year term.*

In his complaint, plaintiff simply alleges that on several occasions he "requested credit for prior service as promised by Vickers on behalf of Local 91." Plaintiff does not state that these requests were made prior to the time he signed the Apprenticeship Agreement, and were otherwise in accordance with Paragraph 10 of the Apprenticeship Standards.

In his deposition, plaintiff testified that sometime in 1984, *after* he had enrolled in the apprenticeship program, he learned that one or more of his co-apprentices had received credit for previous experience and/or training. He testified that he "didn't complain to start," and did not raise the matter of his receiving credit at the next JAC meeting. Instead, because Mr. Vickers, the then Local 91 Business Agent who was also a trustee for the JAC, was not present at that next JAC meeting, plaintiff went to Mr. Vickers office at Local 91. According to plaintiff, Mr. Vickers told him that "when he had sent me out as a first-year apprentice off my referral that I would be given credit for that time." Plaintiff further testified as follows:

I talked to Mr. Vickers, and he told me that I'd be given credit for that time since he had updated me to a first-year apprentice on my job referral. From that point on, I would be getting credit. All right. So it rocked on around to '86, and I still hadn't got any credit. Well, at this time Mr. Vickers was defeated in the election, and Chester Smith become the Business Agent of Local 91.

\* \* \* \* \* \*

I asked him [Mr. Smith] about this credit. And I went over the story with him about the prior credit and my prior conversation with Mr. Vickers about me be-

ing credited, and he told me he'd check into it. So I let it go at that.

And then at the first committee meeting that we had as him as Business Agent that he sat in on, I brought it up, and Mr. Corley again said that there was not going to be any credit given, and that there was some kind of form that needed to be filled out for any credit and be submitted to them, but he never would give me a form or let me see any kind of a form.

Q. "He" being who?

A. Harry Corley.

\* \* \* \* \* \*

Q. So this is the first time, which would have been roughly around May of 1986, that you asked the committee about getting credit for the two years and three months that you'd worked prior to enrolling in the program?

A. Right.

\* \* \* \* \* \*

Q. All right. Was there anything said by any committee member concerning your inquiry about the credit at this meeting?

A. Yes, sir.

Q. What was said?

A. Mr. Corley asked Traywick did he know anything about it, and Mr. Shepherd and everybody just shook their heads and said, "I don't know nothing about it."

Q. Was Mr. Shepherd there also?

A. Yes, sir.

\* \* \* \* \* \*

Q. When Corley asked Mr. Shepherd about the credit, what was his response?

A. That he just shook his head. He didn't know of any, that's what he said.

Q. He didn't know of any credit being given?

A. Right.

\* \* \* \* \* \*

So [later] I talked to Chester about it again, and he said that he'd checked my permanent work record, and I had two years, three months prior service, and that he would talk to the committee about it.

And then later on, I just started talking to Mr. Shepherd about it at the school about my credit whenever there was nobody else available to talk to about it, and he denied knowing anything about anybody getting any credit. And I asked him about what the record said—

Q. Let me interrupt you. Is Mr. Shepherd a coordinator?

A. Coordinator of the school.

Q. He's not an officer of the Local, though, is he?

A. He's just a member of the Local.

Q. Go ahead.

A. I asked him about it, and he said he'd looked on the record, and the record showed that they had served their four years in school. I said, "Well, you know that's not true." He says, "Well, are you calling me a liar?" I said, "No, sir, I'm not calling you a liar, but them records are lying, and you know it." And then he got all huffed up and puffed off about it and stomped back off in the office.

According to the plaintiff, he continued to "insist" on being given the credit, and on the afternoon of March 15, 1988, Chester Smith warned him that "if [he] did not back off the credit deal ... [he] would find [him]self no longer a part of this Union or no longer a part of this school." Plaintiff testified that he basically ignored this warning: "I wouldn't back—I didn't back off. The next chance I got to say something to somebody about it, I said something to them about it." He testified that, on the evening of March 15, 1988, he was called out of class by Mr. Shepherd, and was told the JAC[1] wanted to see him because Mr. Shepherd's tires had been cut and someone had called and told him that plaintiff had done it. Plaintiff's version of what transpired that evening when he appeared before the JAC follows:

---

1. Plaintiff testified that the members of the JAC present that evening were Harry Corley, Chester Smith, Jim Traywick, Homer Marlowe, and Wayne Hamilton.

[Mr. Corley] said, "Mr. Payne, we're having some problems down here at the school and some discipline problems." And then at that time he said, "And we just want to know what your intentions are as far as this school and the Local is concerned." I said, "My goal is to still be a pipefitter and to finish school and become a journeyman." And he said, "Well, isn't it true that you wanted a withdrawal?" I said, "yes, sir, I wanted a withdrawal to get on a work permit where I could start making top wages for me and my family that I felt was owed to me."

And he said, "Well, we're having some problems here," and he said, "What did you discuss with Chester Smith about the withdrawal?" And I told him I didn't feel like it was any of his business because I was talking to the Business Agent as an individual, not as the committee. I said, "If you want to know anything, you ask him, because evidently that's where you got your information."

Q. And what did he say after that?

A. He said, "Well, it is true that you called me a son of a bitch?" I said—

Q. That is Mr. Corley talking?

A. Right. I said, "No, sir." I said, "Mr. Shepherd said he wasn't trying to act like a son of a bitch about this credit." I said, "Well, if you ain't trying to act like one, why is everybody else trying to act like one?" And that is the basis of what I said. The best I can remember, that's exactly what I said.

Q. Isn't it true that prior to that occasion you had referred to Mr. Corley as a "revolving son of a bitch"?

A. No, sir. Mr. Shepherd referred to Mr. Corley as a "revolving SOB" in front of about 15 to 20 people.

Q. Where did that take place?

A. At the school.

Q. When?

A. It was prior to this unscheduled meeting on the 15th when they snatched me out of class.

Q. So Mr. Corley asked you all these questions in a meeting?

A. Right.

Q. And you told him what you just said?

A. Yes, sir.

* * * * * *

Q. To the best of your knowledge, is that all that Mr. Corley said at that meeting?

A. No. He said, "You're going to find out just what kind of a son of a bitch I am."

* * * * * *

Q. What did Mr. Marlowe say?

A. He said that—the discipline problem that he spoke of was getting up and going to the bathroom without permission.

Q. Well, had you done that?

A. No, sir.

* * * * * *

Q. Well, did Marlowe say anything else to you?

A. He told me that I didn't know what unionism was all about and at that time I blowed up, and I said, "No, you don't know what anything about unionism is," I said, "because if I go on strike or anything out here, the first thing you're going to do is pull in here with the National Guard and shoot us or do whatever it takes to get us off of it."

Q. Who is Mr. Marlowe?

A. He's some member of the Local that sits on the committee.

At the conclusion of the above-described meeting, Plaintiff was instructed to appear at the next regularly scheduled JAC meeting on April 12, 1988. Plaintiff testified that he "really didn't know what the meeting was to be about" as far as he was concerned, nor was he notified by letter or otherwise. On the evening of April 12, 1988, Mr. Shepherd again got plaintiff out of class to appear before the JAC, and told plaintiff that he thought that plaintiff would be all right if he went in and apologized to the JAC.

When plaintiff appeared at the April 12 JAC meeting, he was told by Mr. Corley that he had to apologize to the instructors and members of his class, and to the JAC

members. Plaintiff was further told that an additional six months would be added to his apprenticeship and that he would be on permanent probation for the duration. In this connection, Mr. Corley testified in deposition as follows:

Mr. Payne was offered an opportunity to apologize for calling the Board and everybody connected with the school a son-of-a-bitch. Mr. Payne was asked to apologize to the Board, the Trustees and his classmates for his attitude. And if Mr. Payne wished to do that he could remain in school, if he was to take a six month penalty, all of which Mr. Payne refused.

This opportunity was given to this man after consideration, after conversation with him, trying to point out where he was out of step with the rest of the school.

He refused completely. He did not want in that school. Upon Mr. Payne's refusal, Mr. Payne was asked to go home and we would advise him of the actions of the Board by registered mail, of which we did.

The certified letter referred to above was dated April 13, 1988, and notified plaintiff as follows:

We hereby notify you that the Board of Directors has unanimously taken action to separate you from the apprentice training program for your conduct and attitude toward the school to include the Board of Directors, the instructors and your classmates.

This action was taken in accordance with the Apprentice Standards for Plumbing, Sprinkler Fitting, and Steamfitting–Pipefitting as approved by the U.S. Department of Labor, Bureau of Apprenticeship and Training. This action was taken at the April 12, 1988 Apprenticeship Committee meeting.

The Plumbers and Steamfitters Local 91, United Association and U.S. Department of Labor, Bureau of Apprenticeship and Training have all been notified of this action.

Also by letter dated April 13, 1987, the JAC notified Local 91 that plaintiff had been dismissed from the Apprenticeship training program. Local 91 in turn notified the UA that plaintiff's apprenticeship agreement had been cancelled, stating that the notification was in accordance with Section 153 of the UA Constitution, and further requesting that appropriate action be taken concerning this notification. Section 153 of the UA Constitution provides as follows:

SEC. 153. (a) Cancellation of an apprentice's agreement, *for a just cause, after notice and hearing by the apprenticeship committee,* shall automatically cancel his membership in the United Association and the Local Union. The committee shall notify the Financial Secretary of the Local Union of all such cancellations and the Financial Secretary shall notify the General Secretary–Treasurer of the United Association.

(b) There shall be no appeal to the United Association by an apprentice on cancellation of his membership.

(Emphasis added).

On May 2, 1988, plaintiff wrote Marvin J. Boede, UA General President, requesting his assistance concerning the termination of plaintiff's apprenticeship, stating that he felt the termination "was done in an unfair and unjust manner ... without proper notification or hearing, without benefit of any consideration or anyone speaking in [plaintiff's] behalf, without anyone testifying as to [plaintiff's] character or attitude." Plaintiff also stated that he felt his termination resulted from among other things his insistence on being credited for the time spent working as a first year apprentice from 1982–1984. Mr. Boede responded to plaintiff's letter by a letter dated May 18, 1988, in which he stated the following:

Please be advised, under the United Association Constitution, apprentices are under the supervision and control of the Local Union Joint Apprenticeship Committee and Section 155(b) [sic] of the Constitution provides that in the event of cancellation of an apprenticeship, there shall be no appeal to the United Association.

The best advice we can offer you would be that you prevail upon the Local Union

and the Joint Apprenticeship Committee to afford you another opportunity.

Thereafter, plaintiff received a letter from Local 91 dated May 23, 1988, which expressly stated that the UA had

*concurred in the action taken by the Jefferson County Joint Apprenticeship Committee dismissing you* from the Apprenticeship Training Program. The U.A. has removed your name from the May, 1988 Cash Sheet, and your membership in the United Association and Local Union 91 is terminated effective May 1, 1988.

(Emphasis added).

The record is otherwise silent as to what, if any, communication, written or oral, occurred between the UA and Local 91 concerning plaintiff's termination.[2]

Plaintiff filed this action against the JAC and its members individually and in their capacity as trustees; Local 91, and the UA, alleging in Count I of his complaint, as amended, that defendants violated the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA) by terminating his membership (1) without proper notice and hearing; (2) in violation of his freedom of speech under 29 U.S.C. § 411(a)(2) and in retaliation for his exercise of same; and (3) in a manner amounting to an improper disciplinary action in violation of 29 U.S.C. § 411(a)(5). Plaintiff also claims that defendants Local 91 and Chester Smith have attempted to have plaintiff terminated from his employment, and that such was arbitrary, discriminatory, hostile, in bad faith, outrageous and extraordinary, with actual malice and wanton indifference to plaintiff's rights. In Count II, plaintiff alleges that his termination amounted to breach of contract and breach of fiduciary duty under the UA Constitution, and that the JAC and its members breached their fiduciary duty under ERISA.

JAC

Plaintiff concedes that the conduct of the JAC defendants is governed by ERISA, not the LMRDA, and therefore his remedy under ERISA is exclusive. Thus, there is no dispute that the apprenticeship program administered by the JAC is an employee welfare benefit plan under ERISA.[3] In his brief at p. 17, plaintiff states that under ERISA, the appropriate standard of review governing the JAC's conduct is the arbitrary and capricious standard adhered to by the Eleventh Circuit. As noted by JAC, the U.S. Supreme Court has recently rejected the "wholesale importation" of that standard into ERISA. *Firestone Tire & Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *Firestone* involved, among other things, claims by beneficiaries, pursuant to 29 U.S.C. § 1132(a)(1)(B), for *benefits* due under the terms of the plan in question. The relief sought by plaintiff herein is more in the nature of an action under 29 U.S.C. § 1132(a)(3)(A) "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

In its decision in *Firestone,* the Supreme Court adopted the *de novo* review standard, with certain exceptions, but expressly stated that its decision was "limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations. We express no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." 109 S.Ct. at 953.

In view of this express reservation by the Court, as well as plaintiff's express citation of the arbitrary and capricious standard, the court deems it appropriate to

---

**2.** In its brief, the UA simply states that "[i]n accordance with Local 91's request that 'appropriate action' be taken under Section 153, plaintiff's name was removed from the Local 91 'cash sheet' (the roll of dues paying Local members) [and his membership automatically cancelled]

effective May 1," referencing the May 23, 1988 letter from the Local to the plaintiff.

**3.** See 29 U.S.C. § 1002(1)(A) in which "apprenticeship or other training programs" are defined as "employee welfare benefit plans."

apply that standard herein. Accordingly, this court's examination is restricted to "finding whether a rational relationship exists between the Trustee's actions and the Plan's purpose." *Deak v. Masters, Mates and Pilots Pension Plan*, 821 F.2d 572, 577 (11th Cir.1987). An administrative decision is arbitrary and capricious when it wholly lacks a rational basis. *Helms v. Monsanto Co.*, 558 F.Supp. 928, 931 (N.D. Ala.1982).

Plaintiff argues that the JAC defendants acted arbitrarily and capriciously when they refused to honor Vicker's commitment to plaintiff that he would receive credit for prior pre-apprentice experience. Plaintiff also contends that the JAC defendants acted arbitrarily and capriciously and in violation of the "documents and instruments governing the plan" (29 U.S.C. § 1104(a)(1)(D)) by failing to follow the procedural safeguards set out in the UA Constitution and in the Apprenticeship Standards [4] in his discipline and dismissal by the JAC.

Concerning disciplinary action, the Apprenticeship Standards, paragraph 17, provide the following:

A. The JATC may take disciplinary action against any apprentice for failure to comply with the Apprenticeship Agreement, supplemental agreements, or the Apprenticeship Standards.

B. Before invoking disciplinary action the JATC should notify the apprentice of the infraction and provide reasonable opportunity for corrective action by the apprentice.

C. *Before invoking any disciplinary action the JATC must notify the apprentice by certified mail to appear before the JATC for a hearing. If the apprentice fails to appear before the JATC, after due notice, such disciplinary action may be invoked without a hearing.*

D. The JATC may discipline an apprentice by postponing advancement from one period of training to the next or by temporarily removing the apprentice from the job, causing loss of employment.

E. The JATC may cancel the Apprenticeship Agreement and remove the apprentice from the training program. Such removal by the JATC shall cancel the classification of the apprentice and the opportunity to complete the training. The registration agency shall be notified of such cancellations.

(Emphasis added).

■ The JAC defendants have not established that they complied with paragraphs B. and C. above prior to notifying plaintiff by certified letter dated April 13, 1989, of their action dismissing plaintiff from the apprentice training program. Nor have they offered any rational basis for disregarding these procedural requisites to disciplinary action. Thus, as to this claim, summary judgment would be inappropriate.

■ As to plaintiff's claim that the JAC defendants arbitrarily and capriciously refused to honor Hiram Vicker's commitment to afford plaintiff due credit for previous experience, the court concludes that there is an insufficient factual basis to determine as a matter of law that defendants did not act arbitrarily and capriciously. The Apprenticeship Standards state that an applicant must request an evaluation of previous experience *prior* to signing the Apprenticeship Agreement, and then substantiate the claims "as the JATC shall require." In his deposition, plaintiff testified that Hiram Vickers had sent him out on the pre-apprentice jobs for which he sought credit, and had assured him that he would get credit for that time. Plaintiff's deposition is unclear, however, whether that assurance was given at the time of the job referrals, at the time plaintiff enrolled in the apprentice training program and signed the Apprenticeship Agreement, or some-

---

**4.** Mentioned previously, these standards, established by the pertinent National Joint Committees, and the Apprenticeship Agreement, of which these standards are expressly considered a part, would appear to constitute the documents and instruments governing the plan in question. A copy of standards adopted by the JAC in April 1987 is contained in the record of this case; a copy of the Apprenticeship Agreement signed by plaintiff, is not.

time thereafter. Plaintiff further testified that Chester Smith, who replaced Hiram Vickers, had agreed to look into the matter of his credit. However, in his deposition, Chester Smith testified that plaintiff's request for credit for past service was not properly presented because "[t]here was no request in writing,[5] no information given rather than just word of mouth." He further noted that a request for credit had to be made "when [plaintiff] started on the apprenticeship program;" however, as his deposition reveals, Smith never sought to verify with Vickers or otherwise whether plaintiff in fact made the request when he began in the program:

[Q.] Who is Hiram Vickers?

A. He is the retired Business Agent from Local Union 91.

Q. And was he your immediate predecessor?

A. Yes.

Q. Are you aware that Mr. Payne contends that he talked to Mr. Vickers about credit for past service?

A. Am I aware that Mr. Payne contends that he talked to him?

Q. Yes.

A. The best I remember, Mr. Payne told me that he talked to Mr. Vickers about that, yes.

Q. Did you do anything to investigate or in any way confirm or disconfirm the truth of Mr. Payne's contention?

A. No.

Q. Did you ever speak to Mr. Vickers about whether or not he had such a conversation with Mr. Payne?

A. I did not, no.

* * * * * *

Q. When was the last time that you ever did speak to Hiram Vickers?

A. I don't recall.

Q. Did you speak to Mr. Vickers any time after he retired?

A. Sure.

* * * * * *

Q. Why did you not contact Mr. Vickers to find out whether or he had ever agreed to give Mr. Payne credit for past service?

* * * * * *

THE WITNESS: I had no reason to talk to Mr. Vickers concerning this matter.

Q. (BY MR. MENDELSOHN) Have you talked to Mr. Vickers concerning this matter since the lawsuit has been filed?

A. No, I have not.

Q. Do you believe that Mr. Payne asked Mr. Vickers for credit for past service?

* * * * * *

THE WITNESS: I have no way of knowing that.

MR. MENDELSOHN: Well, one way of finding out would be to ask Mr. Vickers; wouldn't it?

* * * * * *

THE WITNESS: That would be one way.

On this record, the court cannot conclude as a matter of law that a rational basis existed for JAC's refusal to consider plaintiff's request that he be given credit for previous experience.

### Local 91

■ The claims asserted against Local 91 are that it canceled his membership without proper notice and hearing, in violation of, and in retaliation for the exercise of, his freedom of speech, and improperly disciplined plaintiff. Plaintiff also claimed that Local 91 attempted to have him fired from his job. However, Local 91 has submitted affidavits given by James Harris, the job superintendent of plaintiff's employer in which he directly negates such allegations. In his brief, plaintiff fails to respond to this issue, and as Local 91 points out, plaintiff states his contentions against Local 91 as his claims that it (as well as UA and Smith individually) "expelled him from membership in retaliation for his expression of views, arguments and opinions protected by LMRDA, and that they did so without procedural safeguards

---

5. There is no requirement stated in the Apprenticeship Standards that the request for credit be in writing.

mandated by the statute." It would thus appear that plaintiff has abandoned his claim that Local 91 sought to have him terminated from his employment.

### Procedural Safeguards

 Section 411(a)(5) of the LMRDA provides that

[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (c) afforded a full and fair hearing.

Furthermore, § 411(b) invalidates

[a]ny provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section....

These statutes provide the explanation for the proviso found in section 153(a) of the UA constitution, to wit:

Cancellation of an apprentice's agreement, *for a just cause, after notice and hearing by the apprenticeship committee,* shall automatically cancel his membership in the United Association and the Local Union.

Thus, this question arises: does the UA or Local 91 have a duty under sec. 153(a) to reasonably ascertain prior to canceling his union membership,[6] whether the apprentice's agreement was cancelled "for a just cause, after notice and hearing by the ap-

prenticeship committee?" In view of the clear provisions of § 411(a)(5) and (b), the court concludes that the UA and the local owe the apprentice member such a duty.

 Local 91 contends that the JAC is a separate and autonomous entity, which notified Local 91 of its cancellation of plaintiff's agreement after the fact. Local 91 further contends that it did not participate in the JAC's cancellation. Local 91's responsibility or duty does not *per se* extend to the JAC's actions. However, where some action by the JAC directly results in the suspension or expulsion of a member from a labor organization, such suspension or expulsion may not be merely "automatic." Section 411(a)(5) requires that the procedural safeguards enumerated therein be afforded. On this record, the court cannot conclude as a matter of law that Local 91 (or the UA) exercised its duty to ensure that § 411(a)(5) safeguards were afforded to plaintiff prior to canceling his membership with Local 91 (and the UA).

### Free Speech

Plaintiff contends that Local 91 (and UA) terminated his membership in the union in violation of his freedom of speech under § 411(a)(2).[7] Local 91 argues that notwithstanding the fact that certain of the JAC trustees were also members and/or officers of Local 91,[8] plaintiff never raised at Local 91 meetings his frustrated attempts to obtain pre-enrollment credit in the JAC Program, nor did the subject involve any union business of Local 91. Local 91 further contends that the speech in question concerned only plaintiff and constituted

---

**6.** Local 91 states that it does not concede that plaintiff was a "member" of Local 91 as that term is defined in the LMRDA. Local 91, however, does not proffer any specific argument in this regard on this motion. The court further notes that sections 153 and 154 of the UA constitution presume an Apprentice *member* status; otherwise there would be nothing the cancellation of the apprentice agreement would cancel.

**7.** Section 411(a)(2) provides as follows:
Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business prop-

erly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

**8.** According to plaintiff's deposition, four of the six JAC trustees who canceled his apprenticeship agreement were members of Local 91, one of whom, Chester Smith, was an officer of Local 91.

complaints and criticisms of the actions of a substantial and separate entity and, therefore, did not involve or touch upon Local 91 matters or its membership. Local 91 reasons that because the issue of apprenticeship credit was an issue solely before the JAC, over which Local 91 had no control, the speech in question is not covered by § 411(a)(2).

Both sides cite *Fulton Lodge No. 2 of Int. Ass'n. of Mach. & Aero. Wkrs. v. Nix,* 415 F.2d 212, 217–218 (5th Cir.1969), where the court explained:

> The Bill of Rights (Title I) of the LMRDA did not enjoy an orderly genesis. Consequently the statutory language and the legislative history are a source of confusion as well as enlightenment. The courts, therefore, have substantially shaped the Bill of Rights into a guarantee of union democracy, with the right of free speech enjoying a particularly favored position. The landmark decision interpreting LMRDA § 101(a)(2) is *Salzhandler v. Caputo,* 2 Cir.1963, 316 F.2d 445, in which the Second Circuit held that a union may not subject to retributive disciplinary action a member accused of libeling or slandering a union officer. The *Salzhandler* rationale has been subsequently extended by the courts to protect from disciplinary retribution numerous types of communication.... As the Second Circuit held in *Salzhandler:*
>
> > The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and *criticize* the management of their unions and *the conduct of their officers.* The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence *the intention of Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.*

(Emphasis added).

In the portions of testimony quoted above from plaintiff's deposition, plaintiff states that he had been "warned" by Chester Smith that he had better "back off" on his insistence on the credit for prior work, or he would find himself no longer a part of the Union or the apprenticeship program. As already noted, Chester Smith, served as a JAC trustee and as an officer (business agent) of Local 91, and he therefore knew that cancellation of plaintiff's apprenticeship agreement would result in cancellation of plaintiff's membership in the Local and UA. The criticisms and complaints levied by plaintiff concerned, in part, the conduct of a union officer, even though primarily in his capacity as a JAC trustee. Local 91 relies heavily upon the rationale of *Miller v. Holden,* 535 F.2d 912, 916 (5th Cir.1976), where the court held that in that case, "[b]ecause there is nothing in the complaint or the evidence ... which casts doubt on the independence of the [Education] Trust," a JAC equivalent for UA Local No. 198, the LMRDA claims against the Trust were due to be dismissed.[9]

■ The key language in *Miller* is that there was nothing to cast doubt upon the independence of the Trust from the union. Here, in addition to Chester Smith, three other Local 91 members served on the JAC. For purposes of freedom of speech, it is not essential that plaintiff demonstrate the kind of control of the JAC required in *Miller v. Holden* to hold an apprenticeship program liable under the LMRDA. All that is necessary here is that plaintiff show the speech is protected because it concerned the union or its officers. The court is persuaded that the speech in question was of concern to some or all of the Local 91 members, and particularly its officer Chester Brown. Accordingly, the court cannot conclude as a matter of law that the cancellation of plaintiff's apprenticeship agreement and union membership was not in violation of his rights under § 411(a)(2).

### UA

■ The UA seeks partial summary judgment only as to the claim that plain-

---

9. The court pretermitted consideration of the abstract issue of whether an employer who is merely an alter-ego of a union can be sued under the LMRDA.

tiff's termination of union membership was in retaliation for plaintiff's expression of his views that he should have been granted credit in the apprenticeship program for the time he claims he spent as a pre-apprentice. UA contends the cancellation of plaintiff's UA membership was automatic,[10] and UA was not motivated to cancel his membership to retaliate for any exercise of free speech rights by plaintiff. Plaintiff on the other hand, boldly asserts that

> UA denied plaintiff his free speech rights by acting with full knowledge of plaintiff's contention regarding the reason for his expulsion from the training program and from Local 91.

Plaintiff's assertion is apropos insofar as it points up that an issue of fact exists as to exactly what the UA knew with respect to the reason for plaintiff's expulsion. In order to establish a claim against the UA for the alleged LMRDA violations by the Local, plaintiff need only show that Local 91 was the agent of UA, or that UA "instigated, *supported, ratified* or encouraged" Local 91's allegedly unlawful conduct. *Rodonich v. House Wreckers Union Local 95 of Laborers' Inten. Union of N. America,* 624 F.Supp. 678, 685 (S.D.N.Y.1985). Here, in its May 23, 1988, letter to plaintiff refunding his dues, Local 91 expressly stated in the opening sentence that the UA had "*concurred* in the action taken by the [JAC] dismissing you from the Apprenticeship Training Program." The affidavit of Marion A. Lee, U.A. Assistant General Secretary–Treasurer, specifically denying that the UA "concurred" in the JAC's dismissal of plaintiff, serves only to create an issue of fact improper for resolution on summary judgment.

Based on the foregoing, the motions for summary judgment considered herein are due to be denied.

An appropriate order will be entered.

---

**10.** UA expressly states that it does not seek a determination in advance of trial that plaintiff's loss of union membership pursuant to the automatic termination provision was lawful.